(1.)

# FILED

AUG −9 2006

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

BY _____
DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT

### FOR THE EASTERN DISTRICT OF CALIFORNIA

Paul Cain, CDCR # K-68823
(Name of Plaintiff)
MCSP; P.O Box 409060
(Address of Plaintiff)
Ione, CA 95640

**2 0 6 - CV - 1 7 5 5 FCD KJM PC**

(Case Number)

vs.

Warden R. Campbell; et al.

**COMPLAINT**

JURY TRIAL DEMANDED

_____

(Names of Defendants)

1. Previous Lawsuits:  None.

   A. Have you brought any other lawsuits while a prisoner:    ☐ Yes    ☒ No

   B. If your answer to A is yes, how many?: _Not Applicable._ Describe the lawsuit in the space below. (If there is more than one lawsuit, describe the additional lawsuits on another piece of paper using the same outline.)

   1. Parties to this previous lawsuit:

      Plaintiff _____ Not Applicable. _____

      Defendants _____ Not Applicable. _____

FORM TO BE USED BY A PRISONER IN FILING A COMPLAINT
UNDER THE CIVIL RIGHTS ACT, 42 U.S.C. § 1983

Rev'd 5/99

6

2. Court (if Federal Court. give name of District: if State Court. give name of County)

_____ N/A

3. Docket Number _____ N/A

4. Name of judge to whom case was assigned _____ N/A

5. Disposition (For example: Was the case dismissed? Was it appealed? Is it still pending?)
_____ N/A

6. Approximate date of filing lawsuit _____ N/A

7. Approximate date of disposition _____ N/A

II. Exhaustion of Administrative Remedies

A. Is there a grievance procedure available at your institution?   ☒ Yes and   ☒ No

B. Have you filed a grievance concerning the facts relating to this complaint?

☒ Yes and   ☒ No

If your answer is no, explain why not Part of this Complaint is that the grievance process here at mcsP is a meaningless sham deliberately designed to obfuscate, hinder and delay...

C. Is the grievance process completed?   ☒ Yes   ☐ No

III. Defendants

(In Item A below. place the full name of the defendant in the first blank. his/her official position in the second blank. and his/her place of employment in the third blank. Use item B for the names, positions and places of employment of any additional defendants.)

A. Defendant _See Attached Complaint..._ _____ is employed as _____
_____ at _____

B. Additional defendants _See Attached Complaint..._

_____ [Thirty-four (34) defendants thusfar...] _____

_____

_____

_____

7

2004 Supp. App. 15-A, p.7

IV.    Statement of Claim

(State here as briefly as possible the facts of your case. Describe how each defendant is involved, including dates and places. Do not give any legal arguments or cite any cases or statutes. Attach extra sheets if necessary.)

See Attached Complaint...

V. Relief.

(State briefly exactly what you want the court to do for you. Make no legal arguments. Cite no cases or statutes.)

See Attached Complaint...

Signed this 28th day of ___July___, 2006 .

_____
(Signature of Plaintiff)
Paul Cain

I declare under penalty of perjury that the foregoing is true and correct.

7-28-06
(Date)

_____
(Signature of Plaintiff)
Paul Cain

B

Paul O. Cain (#K68828)
C-12-232 Lower
P.O. Box 409060
Ione, CA 95640

Plaintiff and Class Representative In Propria Persona

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PAUL O. CAIN; BEN V. HARLESS; and ANDREW L. GRANGER, individually and on behalf of all others similarly situated<br><br><br>Plaintiffs,<br><br>v.<br><br>ROSEANNE CAMPBELL; CALIFORNIA DEPART-MENT OF CORRECTIONS AND REHABILITATION; OFFICE OF COMMUNITY RESOURCES; CALIFORNIA STATE PERSONNEL BOARD; MULE CREEK STATE PRISON; JEANNE S. WOODFORD; RODERICK Q. HICKMAN; N. GRANNIS; MIKE BUNNELL; YVETTE PAGE; SYLVIA GARCIA; LINDA ROMERO; J. YATES; E.A. REYES; L.B. REEVES; K. BAKER; | Case No. _____<br><br>COMPLAINT AND CLASS ACTION FOR CIVIL RIGHTS VIOLATIONS, PERMANENT INJUNCTION, DECLARATORY JUDGEMENT AND DAMAGES<br><br>DEMAND FOR JURY TRIAL |

(i.)

C. WHITE; R. HOLTORF; C.T. SMITH;
CDCR MCSP CAPTAINS W. KNIPP; R.J.
ROBINSON; ARNOLD; T.J. STEEL;
LIEUTENANTS M. CHERRY; A.M. KUOLATTA;
J.K. ROGEL; SERGEANTS ESPINOZA; BROWN;
RUTHERFORD; KRUMWEDIE; SERGEANTS
BURTON; K. DOUGHERTY; K. LINDE; E.
RODRIGUEZ; McNEIL; CHAMBERLAIN;
GENTILE; EARL KANIPE; ROBINSON (SLTA);
B. HUDGINS; CHAPLAIN SCOTT A. BARHAM;
MICHAEL R. DRIGGERS; SAMUEL UMODU; VIC
FERERICO; VIRGINIA FAIR-AMITAMLL; CDCR
CORRECTIONAL OFFICERS C. WILLIS, ANDREW
PURCELL, POGUE, WILKENSON, PARKS,
LEWIS, REISS, S. DILL, T. ZIEBERT,
MAKOBSON, MONTANEZ, MENDES, NELSON,
FUENTES, ALLEN, ANDREWS, R. DION;
WILLIAM ELKINS; MAELEY TOM; ANNE
SHEEHAN; SEAN HARRIGAN; FLOYD
SHIMOMURA; RON ALVARADO; RONALD
BARNES; BARRY SMITH; MERRIE KOSHELL;
and ARNOLD SCHWARZENEGGER,

Defendants.

(ii)

1   This complaint is filed by Paul Odinson Cain and by Ben Vidar Harless and
2   Andrew Lee Granger ( collectively " Plaintiffs"),   Plaintiffs all adhere to the Asatrú-
3   Odinist | Pagan | Heathen faith.[1]  The plaintiffs state claims on their own behalf and
4   on behalf of the class alleged herein.  Plaintiffs complain as follows.

5   I.                PRELIMINARY  STATEMENT

6       1.  This action arises from the repeated violation of plaintiffs civil rights under the
7   United States and California Constitutions, and under federal and state law.  This action is
8   brought by Asatrú-Odinist | Pagan | Heathen inmates in the custody of the California Department
9   of Corrections and Rehabilitation ("CDCR") at Mule Creek State Prison ("MCSP") on behalf
10  of a class of all prison inmates who have practiced or have desired to practice Asatrú-Odinism
11  as a faith for over a decade.  Plaintiffs seek relief from ongoing daily religious discrimination,
12  retaliation and the ongoing denial of constitutionally protected religious rights and freedoms.
13      2.  This action filed by state prisoners for punitive, compensatory and special damages and
14  for both permanent injunctive and declarative relief under 42 U.S.C. 1983 alleges violations
15  of religious freedoms, denials of meaningful unobstructed access to the courts, denials of free
16  exercise of religious rights, repeated and ongoing religious discrimination, denials of due process,
17  denials of equal protection of the law, unauthorized deprivation - loss - desecration of personal

18  _____

    [1] The term "Asatrú-Odinist | Pagan | Heathen" as used in this complaint means faith groups
    consisting of Asatruar, Odinists, Wotanists, Celtic Druids, Shamans, Vanic Wiccans and Anglo-Saxon
    witchcraft and other folkish nature-based pagan faiths.

                                    (iii.)

1  religious items and personal property, repeated threats and retaliatory acts of intimidation,
2  complete denial of religious practice and expression while housed in Administrative Segregation,
3  taking outdoor exercise from Administrative Segregation inmates as disciplinary punishment
4  for extended periods, all in violation of the First, Fifth and Eighth and
5  Fourteenth Amendments to the United States Constitution, and R.L.U.I.P.A. 42 U.S.C.
6  2000 cc. The above illegal acts perpetrated by the defendants by either action or
7  omission were committed at all times under color of state law.

8      3. The defendants have gone on unchecked to create and carry out a state-wide
9  unconstitutional policy that subjectively and illegally favors five faith groupings -- Protestant,
10 Catholic, Jewish, Muslim, and Native American ( the "five state-sponsored faiths") --
11 and therefore both encourages and results in unlawful discrimination against both inmates
12 and clergy of all other faiths, in particular for purposes of this case the Asatrú-Odinist/
13 Pagan/ Heathen plaintiffs and hypothetically any clergy they request to volunteer. This
14 illegal policy has been allowed to flourish for over a decade under CDCR's "Code of -
15 Silence", and is now in fact pervasive throughout CDCR institutions and is itself
16 especially manifest in Mule Creek State Prisons' religious accomodation (non) policies, the
17 practices at MCSP (towards inmates, volunteer chaplains and those seeking to volunteer),
18 the illegal actions and ommissions of all named defendants and other CDCR employees
   directed towards Asatrú-Odinist/ Pagan/ Heathen inmates at MCSP and those that seek
   to volunteer there, and the minimum civil service qualifications for paid chaplaincy slots,

(iv.)

1 │ which require that the paid chaplains for those positions fall under one of the Five
2 │ State-Sanctioned Faiths. The effect of this civil service classification system for chaplains
3 │ is privileged accommodation towards inmates and volunteer chaplains who have access
4 │ to one of the Five State-Sanctioned Faiths clergy at MCSP, among other things. The
5 │ above described state-wide policy favoring the Five State-Sanctioned Faiths is collectively
6 │ referred to herein as the "Five State-Sanctioned Faiths Policy." This widespread statewide
7 │ policy as it applies to the Plaintiffs and other similarly situated individuals here at MCSP
8 │ is unconstitutional on its face and as applied.

9 │     4. A significant component of the Five State-Sanctioned Faiths Policy is a
10 │ subjective hiring system for prison chaplains at MCSP (and statewide) that on its face,
11 │ and as applied, discriminates and classifies job applicants and available open positions
12 │ on the basis of religion. There are civil service classifications solely for "Protestant"
13 │ Chaplain, "Catholic" Chaplain, "Jewish" Chaplain, "Muslim" Chaplain, and "Native-
14 │ American" Spiritual Leader. The state has no other chaplain positions. Chaplains (Gothar)
15 │ who practise Asatrú-Odinism as a religion, or any other non-sanctioned religion
16 │ (for example, Wicca, Hindu, Buddhist, Mormons, Jehovah's Witnesses) are automatically
17 │ disqualified from obtaining any position as a state chaplain, regardless of the individual's
18 │ skill as a spiritual advisor or training as an interfaith religious leader. Upon
   │ information and belief, defendants selected and have continued to endorse and promote
   │ the Five State-Sanctioned Faiths pursuant to which they hire chaplains at MCSP and

(v.)

1  statewide based on the content of the faiths and not based on any objective criteria
2  uniformly applied to all faiths in administering the MCSP chaplaincy program. For
3  example, upon information and belief, the religions for which chaplains are hired are
4  not a function of the inmate populations because there are some twenty Asatrú-Odinist
5  inmates alone on "A" Facility MCSP, and some sixty Pagan/Heathens of other
6  denominations (Khemetic Wiccan, Santarian, Gardnerian, etc..), far more than the handful
7  of Jewish faith inmates, not to mention that the requisite criteria for hiring chaplains
8  at MCSP (and statewide) does not at all include interfaith training or training in
9  religious equality and tolerance. This chaplain civil service classification system which
10  sponsors only the Five State-Sanctioned Faiths is referenced herein as the "Five State-
11  Sanctioned Faiths Hiring Policy".

12      5.    By adopting and perpetuating a state system that expressly favors the
13  Five State-Sanctioned Faiths, and elevates them, on a subjective basis, over others, the
14  defendants violate the constitutional prohibitions against government establishment of
15  religion. Inmates at MCSP (and statewide) of the Five State-Sanctioned Faiths are
16  provided with paid chaplains by state position, with the benefits and privileges that
17  "status" provides; inmates such as the plaintiffs and others similarly situated at MCSP
18  get no assistance in contacting potential volunteers, and the existing volunteer chaplains
   are repeatedly hindered and discouraged when attempting to fulfill their desire to volunteer;
   and in any event these volunteer chaplains do not have anywhere near the same or
   equal authority as the paid "Five Faith" chaplains to fully serve to safeguard their inmate

(vi.)

1   congregations, and serve their needs. The plaintiffs have attempted to have Steven
2   McNallen, the founder of the Asatrú Folk Assembly in the United States, granted
3   "Brown Card" status as a volunteer at MCSP as he lives nearby but the defendants
4   have thusfar not assisted the plaintiffs in this reasonable request. The criteria for the
5   hiring of paid chaplains is not objective and content-neutral, with the result that
6   religious accomodation of non-five faith inmates is severely lacking. The resulting
7   effect of the "Five State-Sanctioned Faiths Policy" combined with the "Five State-
8   Sanctioned Faiths Hiring Policy" is a discriminatory two-tier system: the
9   privileged Five State-Sanctioned Faiths on the one hand and all other faiths on
10  the other, without any objective, non-content based basis for making the
11  distinction. This actually goes as far as placing certain inmate faith groups
12  above others.

13      6.   This unconstitutional two-tier system inherent in the Five State-Sanctioned
14  Faiths Policy for a decade now denies Asatrú-Odinist / Pagan / Heathen inmates
15  and clergy alike equal protection under the law. State-employed full-time paid
16  chaplains are provided many benefits and privileges no volunteer unpaid clergy
17  could ever obtain. Asatrú-Odinist / Pagan / Heathen clergy, who are even hampered
18  by defendants in serving as unpaid volunteers at MCSP, if they even get into the
    prison, are denied access to any funding for religious needs and are still further
    denied the much greater access to inmates automatically given as a benefit to Five
    State-Sanctioned paid clergy, with again no objective non-arbitrary justification

(vii.)

1  related to, for example, the inmate population at MCSP's religious preferences
2  or the appearance of equality and professional tolerance. Additionally, because they
3  are under the unpaid "volunteer" label, Asatru-Odinist/Pagan/Heathen clergy lack
4  the same benefits and protections that paid full-time state employees automatically have
5  against harassment, discrimination and blatant mistreatment in the workplace.
6  This honorable court should take note that the defendants repeatedly take advantage of
7  that "shield" being down, protecting their paid staff who perpetuate "Green Wall"-
8  like retaliations under a "code-of-silence" discriminatory system.

9       7. The discriminatory two-tier system created by and inherent in the Five
10  State-Sanctioned Faiths Policy creates a lack of resources and denial of access,
11  thereby denying Asatru-Odinist/Pagan/Heathen inmates the ability to participate
12  in essential religious ceremonies and/or even perform basic religious rites mandated
13  by the Plaintiffs faith. Salaried chaplains, such as defendant Scott A. Barham
14  at MCSP, are openly hostile and deliberately unhelpful to those of the Asatru-Odinist/
15  Pagan/Heathen religions, yet are deliberately and quickly "assigned" to oversee Asatru-
16  Odinist/Pagan/Heathen religious life because of the total absence of Asatru-Odinist/
17  Pagan/Heathen chaplains at MCSP and statewide. In this case, like many cases,
18  the Five State-Sanctioned Faiths "chaplain sponsor" for the Plaintiffs faith group,
   himself a "Protestant" salaried chaplain, took the opportunity to discriminate against
   the Plaintiffs herein repeatedly, after being assigned/forced into the role of our
   "sponsor," prioritizing the needs of the Christian inmate adherents of his faith at

(viii.)

1 | MCSP consistently well above the needs of the Plaintiffs and other similarly
2 | situated inmate adherents, over and over, for more than two years now. Upon
3 | information and belief, not only do the defendants know that this unconstitutional
4 | behavior occurs and has occurred for years, they have taken no adequate steps
5 | to correct such behavior and fail to screen potential hires for such biases. They
6 | also perpetuate a "Code of Silence" in the above regard by failing to correct
7 | these unconstitutional violations for so long. The overall policy of the defendants
8 | named herein, beside the pronounced lack of policy and the fact that they seem
9 | loathe to follow "the spirit and intent" of existing policies, regulations and laws
10 | in general logically results in a prolonged and subtantial burden on Asatrú-Odinists'
11 | free exercise of religion. Further, the Five State-Sanctioned Faiths Policy is the
12 | foundation of a decade old culture of discrimination against Asatrú-Odinist/
13 | Pagan/Heathen inmates that exists unchecked by and among guards, administrative
14 | staff and paid state Chaplains alike at MCSP and statewide. As a direct result,
15 | the Plaintiffs herein are systematically deprived as a "class" at every level of the
16 | benefits and protections enjoyed by other inmates at MCSP practicing state-
17 | sponsored religions. Upon information and belief, the prolonged and substantial
18 | discrimination endured by Asatrú-Odinist/Pagan/Heathen inmates at MCSP and
statewide was by deliberate design meant to in every way discourage Asatrú-Odinist/
Pagan/Heathen inmates from claiming and/or celebrating their faiths, which not
only infringes on the inmates' religious rights but results in many inmates statewide

(xiv.)

1   literally fearing to admit their faith, resulting in artificially low and inaccurate

2   "official" numbers of Asatrú-Odinist/Pagan/Heathen inmates and other non-

3   state sanctioned faiths groups mentioned earlier in this complaint.

4        8. Plaintiffs seek a permanent declaration that the "Five State-Sanctioned

5   Faiths Policy", including the chaplain civil service classification system " Five

6   State-Sanctioned Faiths Hiring Policy" is illegal and unconstitutional. Plaintiffs seek

7   injunctive relief that require the defendants to abolish the current unconstitutional

8   chaplain civil service classifications and conform state chaplain hiring policies

9   and inmate religious accomodation policies to policies based on objective criteria

10  that includes, at least in or as part, inmate population religious preferences

11  and willingness and ability of all state chaplains to serve in a religiously

12  pluralistic environment, as well as an objectively fair allocation of resources. The

13  plaintiffs seek injunctive relief to prohibit the named defendants from further

14  adopting policies, practices, and customs that disparately treat non-five faiths

15  as somehow lesser based on non-objective non-neutral criteria. The injunctive

16  relief sought requires the defendants to reasonably accomodate all inmate religious

17  exercise in a manner that does not result in a substantial burden, let alone a

18  prolonged and substantial burden, on their religious exercise, unless it is in the

furtherance of a compelling governmental interest and unless the defendants use the

least restrictive means of furthering that specific compelling governmental interest.

Any and all such restrictions should be no more restrictive than those applied to

(X.)

1  inmates practicing more common religions. Plaintiffs Cain, Harless, Granger and
2  other similarly situated individuals seek recovery in the forms enumerated in the
3  prayer for relief for discrimination, retaliation and for other violations referenced
4  herein.

5  II. A.)            JURISDICTION AND VENUE

6     9. This Honorable Court has jurisdiction over this action pursuant to 28 u.s.c.
7  §§ 1331 (a), 28 u.s.c. § 1343 (3), 5 u.s.c. § 702, and 42 u.s.c. §§ 2000 bb - 1 (c),
8  2000 cc-2(a) and directly under the United States and California Constitutions. To
9  the extent that defendants engage and have engaged in employment discrimination
10 regarding any and all outside volunteers that the plaintiffs attempt to solicit or have
11 come into mcsp, Title VII of the Civil Rights Act applies, of 1964. This Honorable
12 Court has jurisdiction over the request for declaratory relief pursuant to 28 u.s.c.
13 §§ 2201 and 2202. Injunctive relief is authorized under Fed. R. Civ. P. 65. The
14 Court has supplemental jurisdiction over the state law claims regarding Mr. Cain's
15 personal property pursuant to 28 u.s.c. § 1367. The three plaintiffs bring this
16 action on behalf of both themselves and all other similarly situated inmates
17 at mcsp pursuant to 42 u.s.c. § 1983, 42 u.s.c. §§ 2000 cc et. seq. (RLUIPA)
18 and Title VII of the Civil Rights Act, and claim all available attorneys fees
   plus the reasonable costs of both filing and maintaining this suit at law as well
   as all other remedies available under these laws.

10. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 (b)(2) in that the unlawful policies, practices, actions and ommissions outlined herein were and are committed by agents and employees of the State of California in this district. The unconstitutional conduct giving rise to the claims alleged herein arose in Mule Creek State Prison, Amador County.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

11. The Plaintiffs have exhausted their administrative remedies, to the extent those remedies are not futile or abusive, and, upon information and belief, allege that additional grievances would be futile because they would be decided under the same policies and by the same people. Plaintiffs Cain, Harless and Granger assert that the 602 Inmate Appeals Process itself at MCSP is being used illegally, and as such statewide it is wholly inadequate. Upon information and belief the Plaintiffs will show that this inadequacy is both deliberate and by purposeful design as part of a cumulative "war of attrition" scheme that will reveal itself to be nothing more in the plaintiffs case than a set of widespread elaborate tactics that seek not only to hinder, obfuscate, and delay, but also seek to further an unspoken "code of silence", above safeguarding the plaintiff's rights as a class under the U.S. Constitution.

12. Further, the Asatrú-Odinist/Pagan/Heathen Inmates attempts to file additional grievances have been frustrated by the defendants every single step of the way, who routinely screen out and refuse to process and/or just lose timely filed 602 complaints as part of an all out effort to successfully frustrate the ability of the Asatrú-Odinist/Pagan/Heathen

1 Inmate Class to raise claims with the Court. Upon information and belief,
2 when Defendants do not lose or repeatedly screen back or entirely ignore 602's
3 relating to the matters set forth in this complaint, to prevent ever having to
4 act on such 602's staff of all sorts routinely rotate from yard-to-yard and
5 prison-to-prison, so there is always a totally unreasonable delay in responding
6 and an indefinite time period for administrative action or when relief is allegedly
7 granted the relief granted is always never implemented. Additionally, absent a change
8 in the Five State-Sanctioned Faiths Hiring Policy, the persons responsible for both
9 processing and answering the 602's lack the ability to address fully the deprivations
10 of several substantial constitutional rights at issue.

11 III.       PARTIES

12  12. Plaintiff Paul Odinson Cain is a prisoner currently incarcerated in Mule
13 Creek State Prison, located in Ione, California. Mr. Cain has been a devout practicing
14 member of the Asatrú-Odinist faith for many years. He is an Associate Member
15 of the Rune Guild of Smithville, Texas, an Apprenticed Gothar (Priest) of the
16 Sons of Odin, 1519 Vinland Kindred, and co-founder of MullKaer ("Mule Creek"
17 in Old Norse) Prison Kindred as well as the Kindred Lawspeaker. His beliefs are sincerely
18 held. Mr. Cain has been incarcerated at five(5) or more state prisons in California
 since 1996, including but not limited to R.J. Donovan Correctional Facility at Rock
 Mountain-San Diego; California State Prison-Los Angeles County, Lancaster; Corcoran
 State Prison; and California Institution for Men-Chino.

13. Plaintiff Ben Vidar Harless is a prisoner currently incarcerated in Mule Creek State Prison, located in Ione, CA. Mr. Harless has been a devout practicing member of the Asatrú-Odinist faith for many years. He is an Associate Member of the Rune Guild of Smithville, Texas, a co-founder of MullKaer Prison Kindred as well as the Kindred Odinsgothi ( presiding priest). His beliefs are sincerely held. Mr. Harless has been incarcerated at (two) or more prisons in the state of California, including but not limited to the above and California State Prison-Sacramento.

14. Plaintiff Andrew Lee Granger is a prisoner currently incarcerated at Mule Creek State Prison, located in Ione, CA. Mr. Granger has been a devout practicing member of the Asatrú-Odinist faith for nearly 20 years. He is well-known in and throughout the Asatrú-Odinist/Pagan/Heathen community and respected. His beliefs are of course sincerely held. He is a co-founder of MullKaer Asatrú-Odinist Prison Kindred and it's Erilatz (Rune Master). In the two and one half decades Mr. Granger has been incarcerated, he's been housed in six (6) or more state prisons, including but not limited to, California Men's Colony-San Luis Obispo, California Substance Abuse Treatment Facility-Corcoran, Correctional Training Facility-Soledad, Corcoran State Prison, and San Quentin State Prison. These three inmate Plaintiffs listed supra are of the same faith as some twenty other inmates housed on MCSP's "A" Facility, and are together quite capable of representing this class action.

DEFENDANTS

15.    Defendant Roseanne Campbell ("Campbell") is or was at some time relevant to this complaint the Warden of Mule Creek State Prison, the institution where all plaintiffs are housed at. As such she is and has been responsible for promulgating, supervising the promulgation of, monitoring the compliance with, supervising the monitoring of compliance with, the enforcing and/or supervising the enforcement of policies-practices and procedures effecting the religious rights and constitutional rights of all inmates at MCSP. In her position she is and has been responsible for assuring that all inmates' constitutional rights are safeguarded, such as the plaintiffs' right to free expression of their religion, equal protection of law, due process, access to the courts and to be not subjected to retaliation for filing legitimate grievances. Upon information and belief, Campbell, while Warden at MCSP, directed her subordinant staff to refuse Reverend Patrick McCollum access to Wiccan/Asatru-Odinist/Pagan inmates, thereby refusing Wiccan/Asatru-Odinist/Pagan inmates such as the plaintiffs and others similarly situated access to volunteer unpaid clergy. Engaging in actions that a reasonable person would know to be unconstitutional, Campbell denied Asatru-Odinists'/Pagans'/Heathens' religious accommodation as inmates, integral religious items and artifacts, religious services, obstructed inmates' access to clergy without legitimate or compelling reason, forced inmates to file multiple grievances using an illegal system just to obtain rights to which they were entitled and allowed a virtually prison-wide campaign of retaliations to be carried out against the plaintiffs. Accordingly,

(xv.)

1  as Campbell was at all times mentioned herein acting under color of state law in
2  the course and scope of her employment within CDCR, Campbell is being sued by
3  the plaintiffs in her individual and official capacity.

4  16. The CDCR is the successor-in-interest to the Youth and Adult
5  Correctional Agency ("YACA") and the departments and boards within the agency,
6  including the Department of Corrections, which were all reorganized into the CDCR
7  on July 1, 2005. All reference to the CDCR in this complaint is intended to include
8  predecessors to the CDCR, (e.g. who, like Edward Alamedia, who was the prior
9  CDC Director who was forced into retirement after facing perjury charges for denying
10  that he stopped civil rights based on investigations into the criminal misconduct
11  of prison guards, have overrun it's own budget of $6.4 billion by $543
12  million dollars in 2005). The CDCR is the negligent parent agency of the
13  Institutional Defendants and is responsible for managing the state's adult prison
14  and parole systems with the federal and state funds it wastes. All of the MGSP
15  defendants are ultimately both employed by and responsible to the CDCR.

16  17. The Office of Community Resources ("OCR"), or it's successor within
17  the CDCR, administers, interprets, and formulates religious policy and procedures;
18  acts as liason between the CDCR and major national, state, and local religious
organizations; reviews paid state chaplain selections prior to appointment; and
advises on the conduct of religious programs and in-service training for all chaplains.
The OCR formulates and administers policies and procedures for volunteer activity by

(xvi.)

the community and staff and is responsible for collecting data, and obtaining data for statistical reports and dissemination. Reference to the OCR in this complaint is intended to include its predecessors and successors. The OCR oversees each prison's Community Resource Manager ("CRM"), or in MCSP's case the Associate Warden of Operations ("AWO"), who are charged with overseeing, establishing and maintaining religious programming in the prisons. References to the CRM and AWO in this complaint are intended to reference individuals with such job responsibilities, regardless of whether they were technically known by another title at some point in time.

18. The California State Personnel Board ("SPB") administers the civil service classification system for the state. Reference to the SPB is intended to include its predecessors and successors. The SPB creates and adjusts classes of positions and establishes minimum qualifications for determining the fitness and qualifications of employees for each class of position. The SPB created the civil service classifications for prison chaplains.

19. Mule Creek State Prison ("MCSP") is, and at all times relevant to this lawsuit was, a state correctional facility that operates under the CDCR, duly organized and existing under the laws of the State of California.

20. Defendant Jeanne S. Woodford ("Woodford") is and/or was at all times relevant herein the Director of CDCR, and as such she was at all times responsible for the rules and regulations and policies effecting inmates civil rights, constitutional rights and religious freedoms statewide. Upon information and belief,

(xvii.)

1   Woodford was informed at times relevant to claims asserted herein that the
    CDCR hiring policy for correctional chaplains statewide was unconstitutional
2   because it discriminated against Asatru-Odinist/Pagan/Heathens, and was further
3   informed that there were ongoing other policies, practices, actions and ommissions
4   that discriminated against the Plaintiffs and other similarly situated inmates at
5   MCSP and throughout CDCR. The plaintiffs are informed and believe that
6   since the time to at least the preparing and filing of this action in both her prior
7   capacity as Warden at San Quentin, and her more recent capacity as Director
8   and currently acting Secretary of CDCR, engaging in actions that a reasonable
9   person would know to be unconstitutional, Woodford took no action to investigate
10  the Plaintiffs' claims or to remedy the unconstitutional discrimination.
11  Accordingly, the plaintiffs sue Woodford in her individual and official capacity,
12  who was acting under the authority and color of state law.

13      21.   Defendant Roderick Q. Hickman is and/or was at some time relevant
14  to this complaint the Secretary of the CDCR. Upon information and belief, Hickman
15  ("Hickman") formerly served as Secretary of the Youth and Adult Correctional Agency,
16  which oversaw the former California Department of Corrections, and which has been
17  reorganized into the CDCR. Upon information and belief, Hickman was himself
18  informed in times relevant to these claims asserted herein that the CDCR hiring
    policy for correctional chaplains at MCSP and statewide was unconstitutional because
    it discriminated against Asatru-Odinist/Pagan/Heathen inmates or was the direct
    cause of such discrimination occurring, and that there were ongoing other policies,

(xviii.)

practices, actions and ommissions that illegally discriminated against the Plaintiffs
1  and other similarly situated inmates at MCSP and statewide. Engaging in actions
2  that a reasonable person would know to be unconstitutional while acting under the
3  color of state law in the course and scope of his employment, Plaintiffs sue
4  Hickman in his individual and official capacity.

5          22.    Defendant N. Grannis ("Grannis") is and was at all times
6  relevant to this complaint the Chief of the Inmate Appeals Branch of CDCR,
7  and as such he or she was responsible for overseeing, monitoring and insuring
8  compliance with the rules and regulations pertaining to inmate appeals at all levels.
9  Upon information and belief, Grannis was informed in times relevant to the claims
10  asserted herein that there were ongoing other discriminatory policies, practices, actions,
11  and ommissions that both discriminated against the plaintiffs and others similarly
12  situated and hindered and/or obstructed their free access to the courts for redress
13  of legitimate grievances. Engaging in actions that a reasonable person would know
14  to be unconstitutional while at all times acting under the color of state law,
15  accordingly Grannis is sued in his or her individual and official capacity.

16          23.  Michael D. Bunnell ("Bunnell"), Defendant, is and was at all times
17  relevant to this complaint the Associate Warden of Programs and Housing- MCSP, and
18  as such he was for a time responsible for overseeing, implementing and monitoring
religious free practice and religious accomodations at MCSP, and at all times
he was responsible to ensure that the custody and housing staff were properly trained.
Bunnell threatened retaliation against the Plaintiffs, denied religious accomodations

(XVIV.)

on multiple occasions, denied equal protection of the law and abjectly failed to
1 even enforce existing policies - rules - and regulations effecting the Plaintiffs rights
2 to freely express their beliefs, freely practice those beliefs and their Civil Rights in
3 an unconstitutional way. Engaging in actions that a reasonable person wouldknow
4 to be unconstitutional in the course and scope of his employment and at all times
5 acting expressly under the color of state law, Bunnell is sued by the Plaintiffs
6 in his individual and official capacity.

7      24.   Defendent Yvette M. Page ("Page") is and was at all times relevant
8 to this Complaint the Associate Warden of Central Services - MCSP, and as such on
9 her rests the total overall current responsibility for Religious Programs of inmates at
10 MCSP; and as such she is currently responsible for supervising, revising, monitoring
11 and enforcing the policies - rules - and regulations that effect the religious rights of
12 all inmates at MCSP. Page has denied outside volunteer clergy of the "Pagan"
13 genre access, refused to respond to the Mens Advisory Council's "Religious Subcommittee"
14 agenda, furthered the "Code of Silence" by encouraging unconstitutional policies
15 ad naseum, and steadily maintained an attitude of complete indifference with
16 regard to safeguarding the plaintiffs constitutional rights. Page was informed at all
17 times relevant to the claims asserted herein that there are and were ongoing other
18 discriminatory policies, practices, actions and ommissions that both discriminated against
the plaintiffs and others similarly situated at MCSP and denied the plaintiffs equal
protection of the law. By engaging in multiple actions that a reasonable person would know
to be unconstitutional while at all times acting under the color of state law, Page is

(XX.)

accordingly sued by the Plaintiffs in her individual and official capacity.

25.    Defendant Sylvia Garcia ("Garcia") is and was at all times relevant to this Complaint an Associate Warden of MCSP and as such on her rests the overall responsibility for religious programming in Admistrative Segregation, as well as inmate property claims, and their resolution. As such she is/was responsible for the supervision and monitoring of compliance with and enforcement of policies and procedures effecting the religious rights and all religious freedom, and free expression, and equal protection of both those rights and the law at MCSP. In her position, in the course and scope of her employment, she is responsible for safeguarding an inmate's constitutional rights. Garcia is and was at all times relevant herein acting under the color of state law and is sued in her individual and official capacity.

26.    Defendant Linda Romero ("Romero") is and was at all times relevant to this Complaint an Acting Associate Warden of MCSP, and as such was and is responsible for the supervision and monitoring of compliance with and enforcement of policies and procedures effecting the religious rights and all religious freedom and free expression and equal protection of those rights under the law at MCSP. In her acting position Romero is and was acting under the color of state law in the course of her employment and is sued in her individual and official capacity.

27.    Defendant J. Yates is or was at some time relevant to this Complaint an Associate Warden of some capacity at MCSP, and as such was responsible for the supervision and monitoring of compliance with and enforcement of policies and

(xxi.)

procedures effecting the religious rights and all religious freedom and free expression

1   and equal protection of those and other rights under the law at MCSP. In his

2   or her position J. Yates is or was at some times relevant herein acting under

3   the color of state law in the course of his/her employment and is sued in

4   his or her individual and official capacity.

5   28. Defendant E.A. Reyes ("Reyes") was at some times relevant to this

6   Complaint employed as the Appeals Coordinator at MCSP. As such he is, was and/or

7   has been responsible for the supervising and monitoring the compliance with and the

8   enforcing of policies and procedures effecting the religious rights and constitutional

9   rights of all inmates housed in/at MCSP. In his position he is responsible for

10   assuring that all inmates' constitutional rights are safeguarded. Upon information and

11   belief he has done the exact opposite, both acting himself, and directing his

12   subordinant staff to throw appeals away, not answer appeals at all, and by his

13   inactions and ommissions thereby forcing inmates at MCSP to file multiple grievances

14   through every level ad naseum utilizing an illegal system just to obtain rights to

15   which they were and are entitled to have safeguarded automatically. These illegal

16   underground practices, policies and ommissions have created an atmosphere where

17   inmates are daily subjected to retaliations for filing legitimate grievances, and have

18   allowed a virtually-system-wide campaign of similar illegal retaliations to be carried

out against the plaintiffs. In his position defendant Reyes is and was responsible

for ensuring that inmates do not go through the above on a daily basis, Engaging

in actions that a reasonable person would know to be unconstitutional, at all times

(xxii.)

relevant herein Reyes was acting under the color of state law in the course and

1  scope of his employment and is sued in his individual and official capacity.

2      29.  Defendant L.B. Reeves ("Reeves") was at some times relevant to this

3  Complaint employed as the Appeals Coordinator at MCSP. As such he is, was and/or

4  has been or is currently responsible for the supervising and monitoring the compliance with

5  and the enforcing of policies and procedures effecting the religious rights and civil

6  rights of all inmates housed in or at MCSP. In his position he is responsible for

7  assuring that all inmates' constitutional rights are safeguarded. Upon information and

8  belief he has done and furthered the exact opposite, both acting himself, and directing

9  both his subordinants and all staff to throw inmate appeals away, not answer appeals at

10  all, and by his inactions and ommissions thereby forcing inmates at MCSP to file

11  multiple grievances through every level ad naseum utilizing an illegal system just to

12  futilly hope to obtain rights to which they are entitled to have safeguarded automatically.

13  These illegal underground practices, policies and ommissions have created an atmosphere

14  of deliberate indifference where inmates are daily subjected to retaliations for filing

15  legitimate grievances, and have allowed a virtual system-wide campaign of similar

16  illegal retaliations to be carried out against the plaintiffs. In his position Reeves is and

17  was responsible for ensuring that inmates do not go through the above on a daily basis,

18  Engaging in actions that a reasonable person would know to be unconstitutional, at

all times relevant herein Reeves was acting under the color of state law in the course and

scope of his employment and is sued in his individual and official capacity.

    30.  Defendant K. Baker ("Baker") was and is at all times relevant to this

(xxiii.)

relevant to this complaint employed as the Appeals Coordinator's Designee at MCSP. As
1  such he or she is responsible to follow and enforce policies and procedures effecting
2  the religious rights and civil rights of all inmates at MCSP. In this position he or
3  she is responsible for assuring that all inmates' constitutional rights are safeguarded.
4  Upon information and belief, he or she has in fact done the opposite, either acting
5  himself/herself or at his/her supervisor's direction, by illegally and repeatedly
6  screening back inmate appeals, routing them to staff who both lack the authority
7  to grant and/or aren't responsible for such alltogether, and by Baker's inactions
8  and ommissions thereby forcing inmates at MCSP to file multiple grievances through
9  every level ad naseum utilizing an illegal system just to futily hope to obtain basic
10  civil rights to which they are entitled to have safeguarded by staff automatically. These
11  illegal underground practices, policies and ommissions have created an atmosphere of
12  deliberate indifference, where inmates are daily subjected to retaliations for filing legitimate
13  grievances, and have allowed a virtual system-wide campaign of similar illegal
14  retaliations to be carried out against the plaintiffs. In his/her position K. Baker
15  is responsible to read inmate appeals and properly handle their routing and logging.
16  Engaging in actions that a reasonable person would know to be unconstitutional, at
17  all times relevant herein Baker was acting under the color of state law in the course
18  and scope of his or her employment and is sued in his or her individual and
official capacity.

31.  Defendant C. White ("White") was at all times relevant to this Complaint
employed as the Appeals Coordinator's Designee in the MCSP mailroom. As such he or she

is) was responsible to follow and enforce policies and procedures effecting the religious
1 | rights and civil rights of all inmates at MCSP. In this position White is responsible for
2 | assuring that all inmates' constitutional rights are safeguarded. Upon information and
3 | belief, he or she has in fact done the exact opposite, either acting alone or at his or
4 | her supervisor's direction by illegally repeatedly screening out inmate appeals, routing
5 | them to staff who lack the authority to grant and/or are not responsible for such altogether,
6 | and by White's inactions and ommissions thereby forcing inmates at MCSP to file
7 | multiple grievances through every level ad naseum utilizing an abusively illegal appeals
8 | system just in the futile hope of securing basic civil rights to which they are entitled
9 | to have safeguarded by staff automatically. These illegal underground practices, policies
10 | and ommissions have created a discriminatory atmosphere of deliberate indifference,
11 | where inmates are daily subjected to retaliations for filing legitimate grievances, and
12 | have allowed a virtual system-wide campaign of similar illegal retaliations to be carried
13 | out against the plaintiffs and others similarly situated. White is responsible to read
14 | inmate appeals and properly route and log them expiditiously. Engaging in actions that
15 | a reasonable person would know to be unconstitutional, at all times relevant herein White
16 | was acting under the color of state law in the course and scope of employment and is
17 | sued in his or her individual and official capacity.

18 |        32. Defendant R. Holtorf ("Holtorf") was at all times relevant to this Complaint
employed as the Mailroom Supervisor-MCSP and as such is and was responsible for supervision
and monitoring compliance with policies and procedures dealing with mail and packages.
Repeatedly engaging in actions that a reasonable person would know to be unconstitutional, at

(XXV.)

all times relevant herein Holtorf was acting under the color of state law in the course
1  and scope of her employment and is sued in her individual and official capacity.

2      33.   Defendant C.T. Smith was at some time relevant to this Complaint
3  employed as a Mailroom Supervisor's Designee and as such is responsible for monitoring,
4  compliance with and carrying out policies and procedures dealing with mail and packages.
5  Repeatedly engaging in actions that a reasonable person would know to be unconstitutional,
6  at all times relevant herein Smith was acting under the color of state law in the course
7  and scope of her employment and is sued in her individual and official capacity.

8      34.   Defendant W. W. Knipp was at some times relevant to this Complaint ("Knipp")
9  employed as a Captain on MCSP's "A" Facility and as such is and was responsible for
10  the supervising and monitoring of compliance with inmates rights to religious free practice,
11  ensuring the free expression of their religious beliefs and practices, and all those that
12  safeguard an inmate's civil rights and property rights. Engaging in actions that a
13  reasonable person would know to be unconstitutional, at all times relevant herein Knipp
14  was acting under the color of state law in the course and scope of his employment and
15  is sued in his individual and official capacity.

16      35.   Defendant R.J. Robinson was at some time relevant to this Complaint
17  ("Robinson") employed as a Captain on MCSP's "A" Facility and as such was responsible
18  for the supervising and monitoring of compliance with inmates rights to religious free practice,
ensuring the free expression of their religious beliefs and practices and all those rights that
safeguard an inmate's civil rights and property rights. At all times relevant herein Robinson
was acting under the color of state law in the course and scope of his employment and is

(xxvi.)

sued in his individual and official capacity.

1

      36.   Defendant Arnold ("Arnold") was at some time relevant to this Complaint

2 employed as a Captain on MCSP's "A" Facility and as such was responsible for the

3 supervising and monitoring of compliance with inmate's rights to religious free practice,

4 ensuring the free expression of their religious beliefs and practices, and all those rights that

5 safeguard an inmates basic civil rights and property rights under the law. At all times

6 relevant herein Arnold was acting under the color of state law in the course and scope of his

7 employment and is sued in his individual and official capacity.

8       37.   Defendant T. J. Steel was at some time relevant to this Complaint ("Steel")

9 employed as a Captain on MCSP's "A" Facility and as such was responsible for the

10 supervising and monitoring of compliance with inmate's rights to religious free practice,

11 ensuring the free expression of their religious beliefs and practices, and all those rights that

12 safeguard an inmates basic civil rights and property rights under the law. At all times

13 relevant herein Steel was acting under the color of state law in the course and scope of his

14 employment and is sued in his individual and official capacity.

15       38.   Defendant M. Cherry ("Cherry") was at some times relevant to this Complaint

16 employed as a Lieutenant on MCSP's "A" Facility and as such is and was responsible for

17 the supervising, monitoring and compliance with policies and procedures dealing with inmates'

18 rights to religious free practice, ensuring the free expression of their religious beliefs and

practices, and all those that safeguard an inmates basic civil rights. At all times relevant

herein, engaging in actions that a reasonable person would know to be unconstitutional,

Cherry was acting under color of state law in the course and scope of his employment and

(xxvii.)

is sued in his individual and official capacity.

1      39.   Defendant R.M. Kudlatta ("Kudlatta") was at some time relevant to this
2 Complaint employed as a Lieutenant on MCSP's "A" Facility and as such is and was
3 responsible for the supervising, monitoring and compliance with policies and procedures
4 dealing with inmates' rights to religious free practice, ensuring the free expression of
5 their religious beliefs and practices, and all those that safeguard an inmat(s) basic civil
6 rights and property rights under the law. Engaging in actions that a reasonable person
7 would know to be unconstitutional, at all times relevant herein Kudlatta was acting under
8 color of state law in the course and scope of his employment and is sued in his
9 individual and official capacity.

10      40.   Defendant J.K. Rogel ("Rogel") was at some time relevant to this Complaint
11 employed as an Administrative Segregation Lieutenant on MCSP's "C" Facility and as such
12 is and was responsible for the supervising, monitoring and compliance with policies and
13 procedures dealing with inmate rights to due process, unobstructed access to the courts,
14 adequate law library facilities in Administrative Segregation, religious free practice,
15 ensuring the free expression of their religious beliefs and practices, and all those that safeguard
16 an inmate's basic civil rights and property rights under the law. Engaging freely in actions
17 that a reasonable person would know to be unconstitutional, at all times relevant herein Rogel
18 was acting under color of state law in the course and scope of his employment and is sued
in his individual and official capacity.

     41.   Defendant Espinoza ("Espinoza") was at all times employed as a Receiving
and Release Sergeant at MCSP and as such was responsible for the distribution and

(xxviii.)

receiving of packages and property, and for monitoring the compliance with inmates rights

1  under the rules and regulations to equal protection of the law, and due process of law.

2  Engaging repeatedly in actions that a reasonable person would know to be unconstitutional,

3  at all times relevant herein Espinoza was acting under color of state law in the course

4  and scope of his employment and is sued in his individual and official capacity.

5        42.   Defendant K. Dougherty was at some time employed as a Sergeant on MCSP's

6  "A" Facility relevant to this complaint and as such is and was responsible for the supervising,

7  monitoring and compliance with policies, regulations and procedures dealing with inmate

8  rights to due process during disciplinary hearings, religious free practice, ensuring the

9  religious free practice does not include retaliation by his subordinant staff, ensuring the

10  free expression of their religious beliefs and practices, and those that safeguard an inmate's

11  basic civil rights under the law. Engaging freely in actions that a reasonable person would

12  know to be unconstitutional, at all times relevant herein K. Dougherty was acting under

13  color of state law in the course and scope of his employment and is sued in his

14  individual and official capacity.

15        43.   Defendant Brown ("Brown") was at all times relevant to this complaint employed

16  as a Sergeant on both "A" and "C" Facilities at MCSP, and as such is responsible for

17  the supervising, monitoring and compliance with policies, rules, regulations and procedures

18  dealing with inmate rights to not be retaliated against for petitioning the government for a

redress of grievances, rights to due process during disciplinary detention/ Administrative

Segregation placement, unhindered and meaningful access to the courts, adequate law library

facilities in Administrative Segregation ("Ad-Seg"), religious free practice that does not

(XXVIV.)

include retaliation by himself or subordinant staff, free expression of their religious beliefs and practices, and those rights that safeguard an inmates basic civil rights under the law. Engaging repeatedly in actions that a reasonable person would know to be unconstitutional, at all times relevant herein Brown was acting under color of state law in the course and scope of his employment and is sued in his individual and official capacity.

44.   Defendant Krumwedie ("Krumwedie") was at all times relevant to this Complaint employed as a Sergeant on "A" Facility and later on "C" Facilty and as such is responsible for the supervising, monitoring and compliance with policies, rules, regulations and procedures dealing with inmate rights to not be retaliated against for petitioning the government for a redress of grievances, rights to due process during disciplinary detention / Administrative Segregation placement, unhindered and meaningful access to the courts, adequate law library facilities in Administrative Segregation, religious free practice that does not include retaliation by himself or subordinant staff, free expression of their religious beliefs and practices, and those rights that safeguard an inmates basic civil rights and property due process rights under the law. Engaging repeatedly in actions that a reasonable person would know to be unconstitutional, at all times relevant herein Krumwedie was acting under color of state law in the course and scope of his employment and is sued in his individual and official capacity.

45  Defendants Sergeant Rutherford ("A" Facility), Sergeant Burton ("C" Facility), Sergeant K. Linde ("A" Facility), Sergeant E. Rodriquez ("C" Facility), Sergeant MacNeil ("A" Facility), Sergeant Chamberlain ("C" Facility) and Sergeant Gentile ("C" Facility) were at all times relevant to this Complaint employed as Sergeants at MCSP, and as such

(Xxx.)

are responsible for the supervising, monitoring and compliance with policies, rules, regulations
1  and procedures relating to inmate rights to due process, equal protection of the law,
2  religious free practice, free expression of their religious beliefs and practices, and those
3  rights that safeguard an inmates basic civil rights and property rights under the law.
4  Engaging in actions that a reasonable person would know to be unconstitutional, at all
5  times relevant herein the aforenamed Sergeants were at all times acting under the color
6  of state law in the course and scope of their employment and they are all also sued
7  in their individual and official capacities.

8      46. Defendant Earl Kanipe was at all times relevant herein employed as
9  MCSP's Litigation Coordinator and was to some degree responsible for changing, adopting,
10  and updated policies, rules, regulations and procedures, and supervising and monitoring
11  compliance with and the enforcement of policies, rules, regulations and procedures
12  effecting the religious free practice rights, religions free expression rights and rights to
13  equal protection of law and due process of law of the inmates at MCSP. ("Kanipe")
14  stood by while all around him his co-workers engaged in actions that a reasonable
15  person would know to be unconstitutional, at all times relevant Kanipe was acting under
16  the color of state law in the course and scope of his employment and he is sued in
17  his individual and official capacity.

18      47. Defendant Robinson was at all times relevant to this Complaint employed as
the senior library technical assistant ("S.L.T.A.") at MCSP and as such was dually
responsible for developing and monitoring the departmental inmate library policy at MCSP.
("Robinson") was also responsible for supervising and monitoring compliance with and the enforcem

(xxxi.)

1  library/ law library programs at mcsp by visiting on site to ascertain that all departmental
2  mcsp libraries and law library's at mcsp are operating within established departmental policy
3  and procedure, the above cumulatively effecting an inmates unobstructed and meaningful
4  access to the courts, an inmates rights to adequate law library facilities, an inmates right
5  to not be retaliated against for filing grievances, an inmates rights to due process and
6  equal protection of the law. Engaging in actions or ommissions that a reasonable person
7  would know to be unconstitutional, at all times relevant herein Robinson was acting at
8  all times under color of state law in the course and scope of his employment and is
9  sued in his individual and official capacity.

10      48. Defendant B. Hudgins was at all times relevant to this Complaint employed
11  as the Library Technical Assistant of mcsp's "C" Yard Administrative Segregation, and
12  as such ("Hudgins") was responsible for the monitoring and compliance with policies, rules,
13  regulations and procedures relating to an inmates right to unobstructed and meaningful
14  access to the courts, an inmates right to adequate law library facilities, an inmates right
15  to not be retaliated against for filing grievances, an inmates rights to due process, religious
16  free practice rights, religious free expression rights and equal protection of law. Engaging
17  in actions or ommissions that a reasonable person would know to be unconstitutional, at
18  at times relevant herein Hudgins was acting under color of State law in the course and
    scope of her employment and is sued in his individual and official capacity.

        49. Defendant Scott Barham was at all times relevant to this Complaint employed
    as the Protestant Chaplain mcsp/ Asatrú-Odinist/Wiccan Sponsor, and as such was responsib

                                    (xxxii.)

for the supervising and monitoring the compliance with and enforcement of policies
1  and procedures effecting the religious rights and all religious freedoms and their reasonably
2  free expression and equal protection of those rights of inmates at MCSP. In this position
3  defendant("Barham") was responsible for both ensuring and safeguarding the above inmates'
4  rights. While serving as Protestant Chaplain, engaging in actions that a reasonable
5  person would know to be unconstitutional, Barham obstructed Asatrú-Odinist/Heathen/
6  Pagan inmates access to religious services, banned all Pagan religious special purchase
7  orders after failing to act on previous inmate-generated "proposals", refused to process
8  orders for religious artifacts previous to that when ordered from approved vendors,
9  denied Asatrú-Odinist/Pagan/Heathen inmates religious accomodation, obstructed
10 inmates access to clergy, instructed his chapel clerks to falsify or lose ducat lists
11 for Asatrú/Odinist/Pagan/Heathen inmates so that they could not attend religious
12 services and just in general routinely discriminated against the plaintiffs and others,
13 inciting staff and inmates to take actions to interfere with any and all religious
14 accomodation provided to the Asatrú-Odinist/Pagan/Heathen inmates. Accordingly, Plaintiffs
15 sue Barham in his individual and official capacity, himself acting under color of state law.
16        50.   Defendant Michael R. Driggers was at all times relevant herein employed
17 as the Supervisor of Vocational-Academic Instruction. ("Driggers") engaged in actions
18 and ommissions that a reasonable person would know to be unconstitutional, at all
   times relevant herein Driggers was acting under color of state law in the course and
   scope of his employment and is sued in his individual and official capacity.
          51.   Defendant Samuel Umodu was at all times relevant herein employed as

(1.)

a Vocational Graphic Arts Instructor on MCSP "A" Yard. ("Umodu") engaged in actions and ommissions that a reasonable person would know to be unconstitutional, and at all times relevant herein Umodu was acting under color of state law in the course and scope of his employment and is sued in his individual and official capacity.

52. Defendant Virginia Fair-Amitami ("Amitami") was at all times relevant herein employed as the Supervisor of Academic Instruction. Engaging in actions and ommissions that a reasonable person would know to be unconstitutional, at all times relevant herein Amitami was acting under color of state law in the course and scope of her employment and is sued in her individual and official capacity.

53. Defendant Vic Federico ("Federico") was at all times relevant herein employed as the Supervisor of Correctional Education Programs. Engaging in actions and ommissions that a reasonable person would know to be unconstitutional, at all times relevant herein Federico was acting under color of state law in the course and scope of his employment and is sued in his individual and official capacity.

54. Defendants C. Willis ("Willis"), Andrew Purcell ("Purcell"), Pogue ("Pogue") Wilkenson ("Wilkenson"), Parks ("Parks"), Lewis ("Lewis"), Reiss ("Reiss"), S. Dill ("S. Dill"), T. Ziebert ("Ziebert"), ("Makobson"), Montanez ("Montanez"), Mendes ("Mendes"), Nelson ("Nelson"), Fuentes ("Fuentes"), Allen ("Allen"), Andrews ("Andrews"), R. Dion ("Dion") and any John and Jane Does yet to be named and identified were at all times relevant to this Complaint employed as Corrections Officers on MCSP's "A" and "C" Facilities, and as such are

(2.)

responsible for monitoring the compliance with policies, rules, regulations and procedures

1 | as set forth in the CCR Title 15, The D.O.M., and MCSP Operational Procedures relating

2 | to inmate rights to due process, equal protection of the law, religious free practice,

3 | free expression of their religious beliefs and practices within reason, and those rights

4 | that safeguard an inmates basic civil rights and property rights under the law. Engaging

5 | in actions that reasonable persons would know to be unconstitutional, at all times

6 | relevant herein the aforenamed Corrections Officers were acting under the color of

7 | state law in the course and scope of their employment and they are all sued

8 | in their individual and official capacities.

9 |    55.   Defendant William Elkins is or was at some time relevant to this Complaint

10 | a member of the State Personnel Board at some of the times mentioned herein and

11 | currently serves as the Personnel Board's President. Engaging in actions that a reasonable

12 | person would know to be unconstitutional, Elkins wholly failed to review and revise

13 | civil service classifications to conform them to existing antidiscrimination laws;

14 | Accordingly, Plaintiffs sue Elkins in his individual and official capacity.

15 |    56.   Defendant Maeley Tom ("Tom") is or was at some time relevant to this

16 | Complaint a member of the State Personnel Board and currently serves as the

17 | Personnel Board's Vice President.   Accordingly, Plaintiffs sue Tom in his official

18 | capacity.

57.   Defendant Anne Sheehan ("Sheehan") is or was at some time relevant to

this Complaint a member of the State Personnel Board. Accordingly, Plaintiffs sue

Sheehan in her official capacity.

58.   Defendant Sean Harrigan ("Harrigan") is or was at some time relevant to this Complaint a member of the State Personnel Board. Accordingly, Plaintiffs sue Harrigan in his official capacity.

59.   Defendant Floyd Shimomura ("Shimomura") is or was at some time relevant to this Complaint the Executive Officer of the State Personnel Board. Accordingly, Plaintiffs sue Shimomura in his official capacity.

60.   Defendant Ron Alvarado ("Alvarado") is or was at some time relevant to this Complaint a member of the State Personnel Board. Accordingly, Plaintiffs sue Alvarado in his official capacity.

61.   Defendant Ronald Barnes ("Barnes") is or was at some time relevant to this Complaint the Special Assistant to the Undersecretary of YACA. Barnes was informed at times relevant to the claims herein that the CDCR hiring policy for paid correctional chaplains was unconstitutional because it discriminated against Asatrú-Odinists/Pagans/Heathen inmates and clergy, and that there were other ongoing policies, practices, actions and ommissions that discriminated against the plaintiffs. Engaging in actions that a reasonable person would know to be unconstitutional, Barnes allowed the discrimination to continue to date. Accordingly, Plaintiffs sue Barnes in his individual and official capacity.

62.   Defendant Barry Smith is or was at some time relevant to this Complaint the manager of the Office of Community Resources ("O.C.R."), and as such was informed at times relevant to claims alleged herein that the CDCR hiring policy for paid correctional chaplains was unconstitutional because it discriminated against

Asatrú-Odinists and other non-Five State Sanctioned Faith inmates and their clergy. Engaging in actions that a reasonable person would know to be unconstitutional, ("Smith") has taken affirmative actions to disrupt volunteer non-paid chaplaincy work in California Correctional Institutions, allowing the discriminations spoken of herein to continue on ad naseum. Accordingly, Plaintiffs sue Smith in his individual and official capacity.

63.    Defendant Merrie Koshell ("Koshell") is or was at some time relevant to this Complaint the Assistant Director of the O.C.R. or its successor. Accordingly, Plaintiffs sue Koshell in her official capacity.

64.    Defendant Arnold Schwarzenegger is and was at some time relevant to this Complaint the governor of the State of California. Accordingly, Plaintiffs sue Arnold Schwarzenegger in his official capacity.

65.    All individuals named in this suit are being sued in their official capacities. Unless otherwise noted, when they are only in their official capacity, they are referred to herein collectively as "Official Capacity Defendants". Pursuant to Federal Rule of Civil Procedure 25 (d) the naming of the officials in their official capacity is intended to and does reach the conduct of all predecessors and successors to their positions during the relevant time period.

66.    All defendants, and multiple groupings of defined defendant groups, are referred to herein collectively as "Defendants."

67.    Upon information and belief, the Asatrú-Odinist/Pagan/Heathen inmates were, and/or will be, in the custody of the CDCR during the times relevant to this

(5.)

## III. A.        CLASS ACTION ALLEGATIONS

68.   The Asatrú-Odinist / Pagan / Heathen Inmates seek to maintain this action on behalf of themselves and all others similarly situated at MCSP pursuant to Rules (23(a)) and (23(b)) of the Federal Rules of Civil Procedure. The three plaintiffs seek to represent a class of all Asatrú-Odinist / Pagan / Heathen inmates at MCSP, including but not limited to Asatruar, Odinists, Wotanists, Norse or Celtic Pagans, Celtic Druids, Norse or Celtic Shamans, Vanic or Anglo-Saxon Witchcraft, Dutch Hexcraft, Vanic Wiccans and other similar folkish nature-based Northern European faiths who are and/or have been confined at MCSP from the times the claims arose as alleged in this complaint to the present ( the "Asatrú-Odinist / Pagan / Heathen Class") and who will be so confined in the future. As a direct result of their confinement, members of the class including the Plaintiffs are or will be subjected to continued and multiple ongoing violations of the rights to free exercise of religion, freedom from state establishment of religion, freedom from retaliatory and discriminatory treatment on the basis of religion, and the guarantees of equal protection under the law. The plaintiffs represent a class of persons seeking declarative and injunctive relief to eliminate Defendants' actions, ommissions, policies, and practices that deprive them of those rights.

69.   It is estimated conservatively that a substantial number of persons incarcerated in the California prison system practice Pagan religions of some sort (at least 600 according to the CDCR's own internal survey of inmate religious

(61)

preferences dated September 10, 2002). Upon information and belief, the Plaintiffs alledge that but for the discriminations and retaliations and their resulting stigmas that number would be much higher. Plainly put, the Defendants want to keep this religious classification silenced and discouraged, even scared. There are some twenty Asatrú-Odinists on "A" Facility alone who attend worship/study services regularly, despite the "stigmas", and there are about five more who do not attend just for that fact or because of it. Additionally there are some sixty Wiccans of all nationalities on "A" yard who also face the same discriminatory and retaliatory mistreatments. There are three other facilities in MCSP ("B" Facility, "C" Facility and a Minimum Yard), no doubt with comparable numbers. As such, the proposed class is so numerous just at MCSP that joinder of all members is impracticable.

70.   Whether the Defendants have violated the "Asatrú-Odinist/Pagan/Heathen-Class's" rights to unobstructed and meaningful access to the courts, free exercise of religion, equal protection of law, freedom from state establishment of religion, due process and freedom from retaliatory religious discrimination are questions common to the claims of the entire class. The Defendants' policies, practices and ommissions with regard to religious accommodation, and with regard to their discriminatory CDCR paid chaplain hiring policy, as set forth herein, also present questions of fact common to the class as a whole.

71.   The claims of the Asatrú-Odinist/Pagan/Heathen Inmate plaintiffs are typical of the claims of the class at MCSP, and the Defendants have acted and

(71.)

refused to act on grounds generally applicable to the class at mcsp, therefore final injunctive relief with respect to the class as a whole is warranted.

72. Under the auspices of the Five State-Sanctioned Faiths Policy on its face and as applied by Defendants, the Asatrú-Odinist / Pagan / Heathen Plaintiffs and class members are routinely experiencing discriminatory and unequal treatment, including without limitation:

(a) denial of access to clergy, religious services, religious rights and religious literatures;

(b) confiscation, desecration, loss and/or destruction of religious artifacts;

(c) denial of any adequate or reasonable access to funds for religious activities;

(d) denial of Earned Time Off (E.T.O.) from work for religious holidays and services;

(e) denial of access to religious counseling in times of personal crisis, such as death;

(f) frequent subjection to ridicule by staff, humiliation and derogatory and stigmatizing treatment, including false and derogatory statements regarding class members' religion, character and deity;

(g) unequal retaliatory treatment and retaliation in the administrative "602" process for grievances;

(h) receiving more severe punishment than other inmates at mcsp receive for substantially similar infractions;

(i) falsifying state documents to retaliate based on religious preference;

(j) withholding and/or tampering with food as "punishment" for filing grievances;

(k) threats of violence based on religious preference;

(l) differential, disrespectful, disdainful and unprofessional treatment of the Asatrú-Odinist / Pagan / Heathen Class members and their surroundings and properties.

(8.)

IV. Statement of Plaintiff's Claims; Facts of the Case.

A. Issue #1 - The C.D.C.R. "602 Inmate Appeals Process" as Utilized At MCSP. is Both Unconstitutional and Illegal.

Founded upon the voluminous evidence that ten years of firsthand knowledge affords, Plaintiff Mr. Cain will show and prove that the 602 Inmate Appeals process & system at M.C.S.P. is in fact a meaningless "sham" of a pseudo-process, rife with illegal "game playing" stall tactics whose obvious design is to obfuscate the issue(s) and hinder and/or discourage one from aggrieving his issues in a Court of law.

Arrogantly without a moment's hesitation the Appeals Coordinator E. Reyes or his designee(s) illegally "screens out" an inordinant number of all appeals, and in Mr. Cain's case, all of his appeals. This is done with absolutely ZERO effort to resolve any of the grievances mentioned. Upon information and belief, the Plaintiff contends that the appeals sometimes aren't even read, as the facts will prove.

A memorandum was circulated to all staff at MCSP, that "All Informal Level appeals are not tracked" (with a log number), and that exact verbiage was underlined. The obvious effect is a "heads up" to

(9.)

any and all mcsp/c.o.c.r. employee's, that should they initially
receive an inmate's appeal they are free to trash it, ignore it or
do as they please... That fact alone bears serious question when an
1  inmate such as Mr. Cain submits an appeal aggrieving lost or misplaced
2  personal property, as he did. The California Code of Regulations, Title 15,
3  (here after abbreviated "C.C.R. 15"...) § [3084.2. Appeal Preparation] states at
4  (b) - "Informal attempt prerequisite. The inmate shall attempt to resolve
5  the grievance informally with involved staff...". [Emphasis mine] C.C.R. 15,
6  [§3000.5. Rules of Construction.] at (c) state that "Shall is mandatory";
7  Right on the "Inmate/ Parolee Appeal Form" itself it states that an inmate must
8  appeal within 15 days of an action taken. Further, according again to
9  regulations, [C.C.R. 15 § 3084.6] requires that an inmate give the staff
10  member "ten working days" to complete their response.
11

12     So, when an Inmate Plaintiff such as Mr. Cain follows the rules
13  and regulations, but all mcsp staff throw out his informal level appeals
14  as 'routine practice', well then that gives Mr. Cain three [3] days to
15  again appeal anew, instead of the 15 spoken of supra.
16

17     One further "screen out", which is also routine happenstance at mcsp,
18  or worse, it gets somehow mysteriously lost again at the FoRmAL/FiRst
level of Review, and Mr. Cain's "time constraints" have expired and thus

(10.)

his appeal is moot and his personal property is forfeit. The illegality
and unconstitutionality is that MCSP staff under Warden R. Campbell's
charge caused that forfeiture, and further routinely do so, as a practice
1   of saying "this is what happens to an inmate if he files an appeal"...
2   Upon information and belief Plaintiff asserts, that pertaining to property
3   that inmates are both permitted to purchase and possess from approved
4   vendors, this "illegal forfeiture" described supra and infra is deliberately done
5   to retaliate against inmate appellants and at the same time reward confidential
6   informants with this illegally seized property, in what amounts to extortion...
7   This is in direct violation to CCR 15 ,[§ 3010. Gifts and Gratuities], [§ 3391. -
8   Employee Conduct], and[§ 3399. Transactions/3400. Familiarity].
9
10   Under CCR 15 [§ 3084.4. Appeal System Abuse] at (a) it states that
11   "One appellant's submission of more than one non-emergency appeal within a
12   seven-calendar-day period shall be considered excessive". That section of
13   the CCR15 (§3084.4. et al.) goes on to outline how an inmate shall be
14   further restricted for excessive filings. The fact that the defendants are
15   loath to follow their own regulations here at M.C.S.P., while they hold inmates
16   to each and every aspect of such, shows the system as egregious and absurd.
17   Beyond that, when the defendants turn a singular grievance into two by their
18   own deliberate "behind the scenes" illegal machinations, it becomes plain that they
are manipulating a system that, when followed, works. That fact that they

are illegally doing so evidences their deliberate indifference to the regulations, the law and my right to petition the government for redress of my grievances under the First Amendment to the United States Constitution. Plainly put, the
1   defendants do not want Mr. Cain to have due process in regards to either
2   having his claims fairly reviewed, or procedurally according to regulation, as
3   is his right under both the Fifth and Fourteenth Amendments to the U.S.
4   Constitution.
5
6       What follows is just how widespread the illegality and unconstitutionality is—
7
8       "Staff Misconduct" Complaints are routed through the Warden, who does
9   everything but see that they are investigated. R. Campbell routinely redesignates
10  the appeal as anything other than "Staff Misconduct".
11
12      As noted on page nine, line 10, the Appeals Coordinator E. Reyes and/or
13  his designee(s) then illegally "screens out" the re-categorized appeal with blatant
14  disregard for the law. (The California Penal Code § 832.5 states that "complaints
15  and any reports or findings relating to complaints must be retained by C.D.C.R.
16  for at least five years".) Plaintiff has voluminous evidence of all of thee above,
17  in his withheld legal property.
18

Contrary to CCR 15, [§ 3084.5. Levels of Appeal Review and Disposition] the Plaintiff almost never receives a personal interview at the First level of review. When reviews do occur in person, which is rarely in Mr. Cain's case, quite often the "assigned reviewer" does not have the authority to grant the "action-requested"?

Yet another tactic that the defendants utilize is to take it to a day or two AFTER their response was due to conduct an "interview", and then the appellant waits another two weeks for it to come back to him through the intra facility mail. And when the appeal arrives in the plaintiffs hands, the reviewer often quotes subsections of the CCR 15 that do not even apply or utilizes baseless arguments to spuriously deny one's appeal.

Finally, defying logic, at the Third Level "Directors" Review, defendant N. Grannis or his/her designee outright deny appeals of the plaintiffs that have themselves been "partially granted" at lower levels of review.

In the well-designed plan implemented by C.D.C.R. Directors, going back no doubt decades, Administrative and Custody staff routinely rotate from yard-to-yard and prison-to-prison, from Warden's on down to Appeals Coordinators, (to not have to explain their illegal behaviors), and merely claim "Good Faith" immunity. When that "fact" is added into this unconstitutional appeals system, it's easy

(13.)

to perceive and discern that the defendants have an underhanded illegal "scheme" firmly ensconced behind a forced silence. Recently C.D.C.R. and its Administrators, with the political and financial clout of the California

1   Correctional Peace Officers Association (C.C.P.O.A.) behind them, have come
2   under fire for perpetuating a "code of silence" utilizing Gestapo-like
3   "Green Wall" tactics, at whatever the cost. The "costs" here are the
4   Plaintiffs basic Civil Rights under the United States Constitution in this
5   instant Complaint now before this just Court.
6

7       From Mr. Cain and other inmates perspectives' the consensus that's passed
8   "word-of-mouth" is that inmates will almost assuredly be retaliated against
9   for filing an Appeal (602); His (and his cellmates) cell will be trashed;
10   (Plaintiffs was, multiple times.); His mail will come up missing; (Mr. Cain's
11   magazines, mail and religious orders have.); He'll have to bear daily
12   snide comments, derogatory remarks and a pointed "retaliatory" scrutiny; or
13   even worse if circumstances justify the mistreatment in nothing but the officer's
14   eyes.
15

16       Back in late June of 2005, defendant Sergeant Brown called the Plaintiff
17   to report to the "A" facility Program Office, where he asked Mr. Cain to
18   ".. give me a reason why I shouldn't send you to the hole, right now!?",
while waiving an "Administrative Notice of Law" that Plaintiff had mailed

out to him (defendant Brown) "Legal Mail"; (along with other staff
and administrators at M.C.S.P. such as J. Woodford, N. Grannis, R. Campbell,
M. Bunnell, J. Yates, Y. Page, S. Barham, E. Kanipe, etc...) Plaintiff

1 | Mr. Cain responded with "Because it's illegal to retaliate against me for
2 | serving you with an "Administrative Notice of Law", as it violates my rights
3 | under the First Amendment to the U.S. Constitution to do so." He yelled
4 | at me for about five minutes, repeating his initial question initially
5 | a few times, and asking things like "Why did you put my name on this?!",
6 | "What have I ever done to you?" and "Why shouldn't I feel threatened...
7 | by this?"... He (defendant Brown) threatened the Plaintiff herein no less
8 | than five times with "sending him to the hole". In hindsight, what Brown
9 | was attempting to orchestrate was to have the Plaintiff get mad and
10 | state "Go ahead! Send me to the hole then..." so he could use Plaintiff's
11 | own anger against him as "the threat", plus allege (falsely) that I
12 | asked to go to Administrative Segregation for my own safety... I merely
13 | stared at him as he went on his loud drawn-out tirade, and responded in
14 | a calm even tone.
15 |

16 | This "incident" was aggrieved via a Citizen's Complaint alledging "staff-
17 | misconduct", copies of which are in my withheld legal property. Mr. Cain
18 | asks this court to take Judicial Notice that this initial complaint will
necessarily need to be amended further once this Court orders that the defendants

(15.)

reunite me with my legal property, which includes all the memorandums, evidences, notes, research, the §1983 Complaints of Hysell v. C.K. Pliler, etal.; Rouser v. Theo White, et al.; McCollum v. State of California; etc... [A detailed

1    diary has already been sent to the law firm of Jones Day, and my attempt to

2    join in Hysell's and Rouser's complaints was denied.]

3

4    Just in case the defendants have designs to lose my "legal work product/-

5    property", copies of everything have been retained already, outside of this

6    institution.   Plaintiff has seen in the past staff directed to confiscate

7    "so and so's" log, mentioned in "such and such" lawsuit, and has

8    already prepared for that more-than-likely eventuality, even before being

9    sent to Administrative Segregation, where he now resides.

10

11   Despite this issue's "constitutionality" argument as it relates to specific 'stated

12   facts, this Court should not get the impression that I am simply making

13   unexhausted allegations, for I am not. All issues that I bring forth in

14   this Complaint are "exhausted", with all the unconstitutional rigors that

15   that exercise entails. All of those "exhausted appeals" are in my legal property

16   as well, which is being withheld from me and has been for 120 days. Should

17   my personal and legal property be purposefully lost for good, it will only

18   bolster my claims, so defendants are hereby on notice as well.

This issue beg's the question, how doe's an inmate Plaintiff appeal an appeals system which functions to inhibit his appeals adjudication?

1. Not only does the defendants' illegal appeals system not stop there, but MCSP
2. staff members go on to retaliate to such an extent (in such a myriad-of different ways and means) that to consider "one appeal filing" or
3. submittal per week is also unconstitutional. At that rate, based on my
4. diary alone I'd be appealing into 2008 at the First level of Review, with
5. rotating staff and the created delays that the defendant's "games" cause.
6.

7. The cumulative effect of the aforementioned facts and the all-pervasiveness
8. of such "wide-spread practices" at MCSP lend significant credence to the fact
9. that the defendants not only, Knowingly but deliberately come up with this
10. elaborate unconstitutional scheme, AND that they tailored it "behind-the-scenes"
11. as a defense against their illegal activities and inmate lawsuits that have
12. merit as well, with a "code of silence" mentality.
13.

14. In the above regards, Mr. Cain's First Amendments rights to be free of
15. retaliation for filing legitimate grievances, & to have unhindered/unobstructed access
16. to the courts to petition to have grievances heard in a court of law have been
17. fundamentally violated with deliberate indifference, under the United States
18. Constitution, by all of the named defendant's actions, in some capacity or another, all of whom acted under color of state law.

(17.)

Additionally, Plaintiff's right to fundamental due-process of law has been violated, as the weight of the evidence shows more of a desire to retaliate against Mr. Cain than a desire to give his legitimate appeals due consideration. Accordingly, under the Fourteenth Amendment of the

2 || United States Constitution Mr. Cain's rights have also been violated.

3

4       Lastly, in regard's to all appeals submitted by Mr. Cain relating to

5 || religious accomodation issues, and religious discriminations, the defendants

6 || conduct violates the "least restrictive means" standard recently upheld,

7 || which R.L.U.I.P.A. (the Religious Land Use Institutionalized Persons Act of 2000)

8 || outlines.

9

10       B. Issue #2 - The Defendant's Blatantly And Deliberately Ignore An

11       Inmate's Religious Needs If They Practice A Faith That's Not State

12       Sponsored, In Violation of R.L.U.I.P.A And The First Amendment

13       To The United States Constitution.

14       Throughout the California Department of Corrections and Rehabilitation

15 || today there are now five State-sanctioned faiths- Christianity [Protestant],

16 || Christianity [Catholic], Judaism, Native American Beliefs and Islamic Beliefs.

17 || The Native Americans and the Muslims BOTH had to sue to gain their "status".

18 || "Pagan| Heathen" inmates do not yet enjoy that "status", but instead are subjected

③ "Pagan| Heathen" is here defined as a follower of any number of non-convential ancestral-based Native belief systems such as- Asatrú/Wotanism/ Odinism, Wicca, Druidism, Theosophy, Rosicrucianism, Witchcraft (Gardnerian, Alexandrian, etc..), Kabalism, Astrology, Numerology, Santeria and even Voodoo.

(18.)

a widespread unwritten and unspoken but nevertheless present plan to discriminate against them to attempt to discourage them from pursuing their faith's beliefs. This practice serves to 'guide inmates into the fold' so to speak, away from their beliefs towards one of the five State-sponsored religions, by repeatedly and unprofessionally retaliating against those who follow "Pagan/Heathen" faith systems, in a myriad of ways:

A detailed lengthy typewritten "Asatrú/Odinist proposal" was submitted to both Protestant Chaplain Scott Barham and then Associate Warden of Programs and Housing Armand Burrell (that position is currently occupied by Mike Bunnell) back in early March of 2004. This was done at A.W.P.H. Burrell's direction, who was the reviewer of an appeal myself and inmate Granger, #C-36469 had submitted on behalf of a "class" of inmates on "A" facility. This proposal has been resubmitted twice since then in the proceeding two years plus, and to date has never been meaningfully addressed. (Copies of this submitted proposal and all documents, memorandums and appeals to which I refer to in this instant complaint are contained in my legal property, which is being withheld from me back here in Administrative Segregation.)

It's illuminating to point out that our submitted proposal (cited above) was not the first instance of inmate's expressing a need for accomodation; it was just the most thorough well-put-together attempt by inmates who had

(19.)

already resolved not to cave in to pressure or retaliatory attempts to discourage inmates from practicing their religions, which the defendant's obviously were

1 | and are loathe to accomodate. In my withheld "legal property" are documents from inmate Harless (602's, responses, letters, etc...) on his unsuccessful attempts

2 | to resolve his Odinist accomodation requests, dating back to 2001. Upon

3 | information and belief the plaintiff herein asserts that it was rumored that a

4 | Wiccan group on one of the other yards was ordered to disband.

5 |

6 | Also currently being kept from me, is a detailed "Diary/Log", which is

7 | also in my withheld-from-me legal property. It contains innumerable attempts

8 | to meet with various defendants in the attempt to positively resolve a

9 | functioning religious program for Asatrú-Odinist inmate adherents and

10 | Pagan/Heathen inmates in general.

11 |

12 | Plaintiffs obtained a copy of a religious D.O.M. (Departmental Operation

13 | Manual) Supplement back in late 2004, with a "cover sheet" directing

14 | Chaplains like Scott Borham to meet with inmates of those affected faith

15 | groups to discuss it's implementation. It had a "due date" of 2004;

16 | specifically November. Therein the defendants acknowledged that at all

17 | times must they utilize the "least restrictive means" test of R.L.U.I.P.A.,...

18 | The document also acknowledges the First Amendment to the United States

Constitution, and R.F.R.A., and by doing so this document shows that

(20.)

for years the defendants have been aware of their duty to safeguard
inmates Constitutional rights when it comes to religion and it's free
practice. No defendant named herein has EVER sought to sit down
1  with representatives of the faith group's affected by this document's
2  eventual imposition, to hash a religious program out that works for
3  "Pagan / Heathen" or Asatrú / Odinist inmate adherents, to Mr. Cain's
4  Knowledge to date. The fact that it remains significantly unaddressed
5  (with almost 80 "Pagan / Heathen" inmates on "A" facility alone), and
6  the fact that it hasn't yet been signed almost two years later, goes
7  right to the heart of the matter.
8
9  Further, on January 25th, (or approximately thereabout) of 2006, in
10 my elected capacity as "A" facilitie's Men's Advisory Council Religious Sub-
11 committee Chairman, I submitted an Agenda for discussion which
12 contained ten issues that the inmate population had requested I bring forth.
13 That request for a meeting and proposed agenda was twice sent to Associate
14 Wardens Yvette Page, Mike Bunnel and Protestant Chaplain Scott Barham.
15 It was never responded to.
16
17 This is not too mention that in addition to all of the above, Plaintiff
18 Mr. Cain is made to utilize the broken sham of a 602 Appeals quasi-System
for every single instance of his religious free-practice accomodation, along with all

(21.)

other Asatrú-Odinist inmate adherents on "A" facility and all other "Pagan/Heathen" inmate adherents as well, from being afforded classroom time, to obtaining basic integral ritual items, to being permitted time off of a work or education
1 assignment, to being released on time, to having an assigned inmate chapel
2 clerk of the "Pagan/Heathen" genre, to being permitted to purchase food items
3 from outside religious vendors, etc... Every single time a "Pagan/Heathen" inmate(s)
4 desires to be treated like other similarly situated inmates are **already**
5 **being treated** of the other five state-sanctioned faiths, he is made to jump
6 through the illegal unconstitutional hoop mentioned in Issue #1, over and
7 over. Being one of three co-founders of "A" facilitie's ⑨MullKaer Asatrú-
8 Odinist Worship/Study Kindred (of some 17 inmates who attend), and the
9 Kindred Lawspeaker since its inception, Plaintiff Mr. Cain has amassed
10 considerable evidence of the above, which is all in his currently withheld
11 "legal property".
12

13 Upon information and belief Mr. Cain asserts that once he is reunited
14 with his withheld legal property even more instances of the defendant's unwillingness
15 to act will become apparent, and this Complaint will need to be amended.
16

17 Multiple defendants were served with an Administrative Notice of Law
18 outlining how those under their charge acting under color of state law were
deliberately failing to act to correct violations of inmates constitutional rights

⑨ "MullKaer" means Mule Creek        (22.)
in Old Norse.

that were (and still are) regularly occurring here at Mule Creek State Prison—from the Warden Roseanne Campbell, to the Director Jeanne Woodford, to the Governor Arnold Schwarzenegger, on down to custody yard staff on "A" facility. Those notices are also contained in my legal property which is being withheld from me. These Administrative Notices of Law were sent out by the Plaintiff Mr. Cain "Legal Mail" on June 6th, 2005 and to date the constitutional violations spoken of therein have not been remedied.

By not acting upon the legitimate requests of Mr. Cain and other Asatrú-Odinist inmates for basic religious accomodations, by placing certain faith's needs first and other unspensored faiths are a distant second (if not ignored), by not encouraging the professionalism which meaningful non-discriminatory dialogue brings, by not further amending or at all acting to amend a D.O.M. Supplement on "Religious Programs" that has been in limbo since November of 2004 and thereby causing said document to remained unsigned and/or unapproved, the Defendants are showing that their illegal and discriminatory psuedo-standard, itself in direct contradiction to the "least restrictive means" test of R.L.U.I.P.A. is more important than safeguarding an inmates constitutional rights under the First Amendment to the United States Constitution to freely practice one's religion and to be free of State-sponsored religious discriminations. This after they have been served with an Administrative Notice of Law, some eleven months ago. As State Employees all the named defendants herein have a

(23.)

duty to uphold the law, and the Supreme Law of the Land is the United States Constitution. Further, they have a duty to correct and report illegal misconduct, once they become aware of it. The fact that no one corrected anything after receiving an Administrative Notice outlining a problematic area(s) is evidence that the defendants sought to perpetuate their "Code of Silence" above religious equality and ending illegal discriminatory misconducts.

Accordingly Mr. Cain's rights under the Free Exercise Clause of the First Amendment and under R.L.U.I.P.A. have been expressly and repeatedly violated by the defendants failure to act.

C. Issue #3 — Instead Of Acting To Correct Unconstitutional Behaviors And Implementing Much Needed Changes To Existing Policies, Defendants Instead Began A Virtual Campaign Of Blatant Religious Discrimination Reminiscent of Unenlightened Ages Past.

The first thing the defendants did, after refusing to allow us a single time slot in the multi-faith chapel classroom for a once weekly study, and after making us aggrieve that issue, was to eventually concede. However, they placed the Protestant Chaplain over our religious group as our "sponsor", and he assigned his Protestant Inmate Clerk us our faith's clerk, and then the "games" began... We have consistently not come out on the Daily Movement

(24.)

Sheet (D.M.S.), which our clerk is supposed to do. Their faith's clerk proselytizes against our faith, because he is a Protestant and doesn't know

1 any of our faith's holy days, basic needed ritual items, needs, or teachings.
   Each and every time one of our faith's adherents, Plaintiff included,
2 attempted to see our "sponsor," defendant Scott Barham ("A" Facility-
3 Protestant Chaplain), during his weekly open-line, his/our clerk would
4 go into the Chaplain's office and we would be made to wait up to two
5 hours to speak with him only to be outright maliciously lied to. An
6 in-depth "Diary" on these occurrences is also in my currently withheld
7 legal property. This type of repeated discriminatory treatment is exactly
8 why we asked for our own faith's clerk of the general "Pagan/Heathen"
9 genre, and it becomes even more egregious as Plaintiff Mr. Cain
10 himself acted as a "class" representative and filed an appeal through all
11 the levels making the defendant's fully aware of this unconstitutional
12 mistreatment. More than 50 "Pagan/Heathen" inmates signed that
13 appeal. As an issue it was also mentioned in the [6-6-05] "Administrative-
14 Notice of Law" that Plaintiff served on the defendants. Plaintiff had
15 to constantly use his own paper, typewriter and supplies to perform his
16 faith's functions, that the administration/defendants required of all faiths,
17 and pay for copies of such, which the defendants routinely asked each
18 and every one of our adherents to produce. None of the other
   State-sanctioned faiths had to endure this discriminatory treatment.

(25.)

And as if to deliberately exacerbate matters further, Mr. Cain and those of his faith's general genre are REQUIRED to generate more than twice the number of "memorandums for approval" as compared to the five state-sponsored faiths, and then literally chase down staff members whose approving signatures are required, again unlike what other inmate faith groups already enjoy. This deliberate retaliatory behavior is designed solely to discourage those of Plaintiff's faith from practicing their religious beliefs. Staff know full well that we do not have our own clerk, at least not one who isn't so biased against our beliefs as to deliberately sabotage our every effort. The Protestant Inmate clerk was removed as our clerk, by his own request, on October 31st, 2005. Coincidentally, our illustrious "sponsor", defendant Scott Barham also refused to deal with our faith's needs on that same date any longer, telling Plaintiff to "602 Him", because his denominational ordinators have told him that he cannot minister to our needs or he will lose his credentials." Prior to his stepping down he was evasive, untruthful, unforthright and only periodically would he appear helpful. He made no effort to help our volunteer unpaid sponsor acquire his "Brown" card, and defendant Roseanne Campbell herself has to answer for refusing to allow Wiccan Chaplain Pat McCollum into to the institution at all whatsoever as well. Both of the two times the preeminent founder of Modern Day Asatru-Odinism in the United States, Stephen MacNallen, came into the institution we'd had to daily stalk and harangue various staff

(26.)

members such as defendants S. Barham, Captain Robinson, Captain Steel,

Sgt.'s Rutherford, McNeil and Brown; both times virtually begging in defendant

1 Pastor S. Barham's office to have him call Mr. MacNallen at home to facilitate

2 his coming into the institution like he'd been waiting to do, always only

3 getting a facility answering machine and no response. One Asatrú-Odinist

4 inmate sent Mr. MacNallen a $90 donation for his travel expenses out of

5 his own trust account. Other faith group's that are state-sponsored have

6 visitors bi-weekly and a full-time paid religious advisor/sponsor. The

7 plaintiff's religious needs are obviously on the opposite end of the State's spectrum,

8 C.D.C.R. included in the moniker of "the States"...

9

10 The above discriminatory behavior by the defendants is just the tip of the

11 proverbial iceberg... To go on, Plaintiff adds that for no justifiable

12 reason the defendants sought to "play games"- [#1] by both moving our assigned

13 outdoor area and stating that they plan to move it yet again; [#2] by starting

14 unsubstantiated rumors and repeatedly making derogatory comments about those

15 who adhere to Asatrú-Odinism and Wicca; [#3] by making us vacate the chapel

16 classroom for no reason; [#4] by never announcing Asatru-Odinist or Wiccan

17 worship study classes and/or services but instead routinely letting us out late

18 or not at all; [#5] not signing the memorandums that they require we have

signed to freely practice our religion; [#6] by removing the offerings that our

adherents, Plaintiffs included, leave on their spiritual grounds for the land wights;

(27.)

[#7.] by intruding upon our worship study group services and our rituals merely to harass and make discriminatory comments; [#8.] by spitting on our approved outdoor

1  stead in front of multiple inmate adherents, thereby deliberately desecrating our
2  hallowed grounds; [#9.] by not acting to erect a fence around our designated area
3  and subsequently construct a fire-pit as repeatedly requested; [#10.] by hindering
4  our faith group's "outside vendor" orders for twice yearly Holy Feasts; [#11.] by refusing
5  to copy our study materials for our worship study group; [#12.] by not allocating
6  automatically what other state-sponsored faith groups already receive and enjoy,
7  instead making us appeal and aggrieve utilizing their illegal system for each
8  and every single thing we request; [#13.] and more, which will become evident
9  when my legal property is re-issued to me. Again, logically this Complaint
10  will need to be amended, since this is all off the top of my head.
11
12  Additionally, [#14.] no religious books are available (of my faith) back here in
13  Administrative Segregation, where I've been for 20+ days now, and Plaintiff
14  Mr. Cain was/is not permitted to acquire any out of his stored personal property,
15  which is only some ten feet away from his cell, and c/o's Montanez and
16  Mendes refused to give me my Asatru-Odinist Hammer pendant, although other
17  inmates are allowed crosses on chains back here in Ad-Seg. C/o Montanez
18  taunted me, saying "You only get a Bible - that's it!" and laughed, when
   he came to my cell-door, knowing that I have a library of some 30 personal

(28.)

religious texts in my personal property, itself stored some ten feet from my cell.
[Before completion of this complaint, I've discovered that my books are all
missing.]

1      What follows is a description from memory of the defendant's contemptible

2    pattern of repeated discriminations - (again I do not have my legal property

3    in my possession at this time, so this will all of course needed to be amended

4    to make more precise these truthful allegations):

5

6    #1.) Defendants sought to "play games" by moving our assigned outdoor religious

7    gathering area, and intimating that they are going to continue to do so for

8    various "created" yet unjustified " security concerns";

9

10      We had been meeting outdoors to the right of "A" Yard's visiting sidewalk

11    in the adjacent grass area once monthly for our Holy Rituals termed "Blöts"

12    (pronounced "bloats") for the entire year preceeding our May 1st, 2005

13    May Day/Walpurgisnacht Blot, without a single incident of any nature ever

14    occurring regarding our faith group's adherents. This area was ideal for

15    our use as it was unused, had a water line nearby and it was away

16    from other noisy, congested areas of the yard. Additionally it was directly in

17    front of the Chapel and the Program Office, with a direct line of sight

18    from the yard tower. Out of the blue on 5-1-05 at approximately 9:00 a.m.

       a Sergeant Chamberlain approaches our circle, which was already set up,

and orders us to "move to the other side of the visiting walkway", the left side,
which is even closer to the program office and multi-faith chapel, going on
1 to state that " I don't care if you got started or not! You will move now!
2 My boss, the watch commander told me to move you so I am moving you."
3 Our Blōt was interrupted, moved, and reconvened for that day. When we
4 inquired as to why we were being ordered to move when we hadn't had a
5 single incident ever and had been meeting there regularly for over one year previous,
6 he told me "I don't know the reason, but you will be moving". All this was
7 done even though we had an authorized memorandum giving us permission to
8 briefly occupy our original area; So this was a case of a Sergeant overriding
9 a Captains "approval",

10    The next month we were instructed by defendant Scott Barham, our
11 Protestant Chaplain / Assigned "Sponsor" to move "over behind the volleyball-
12 net at the back of the yard" which we gave immediate vehement opposition
13 to in unison, since not only would volleyballs come flying into our Sacred
14 Circle, but we stressed that the land on which we held our observances was
15 considered sacred to us and people shouldn't be permitted to walk over our
16 offerings left to the land wights (spirits) and our Gods & Goddesses, just like they
17 aren't permitted to even enter the Native Americans' sacred area. It seemed
18 to plaintiff that the above instances were attempts to goad inmates into
disruptive protests, moreso than actions taken to deal with legitimate

(30,)

Cognizable security concerns. Plaintiff points out that that the defendants original imagined "security threat"- someone throwing something over from visiting - could have been cured by erecting a fence around our area which family members of our faith's adherents went so far as to offer to donate. The defendant's never took us up on our offer. Instead we were directed to move our "Asatrú/Odinist Outdoor Area" a third time, to a small thin patch of grass in between Building's Four and Five, on the opposite end of the yard (Facility A). This area was the exact opposite of where we were originally, too small for our needs, with a poor line of sight, and about as far away from the multi-faith chapel and the program office as you can get on Facility A, which becomes important because we are in need of borrowing chairs and one table from the multi-faith chapel classroom until our area is fenced in and outdoor fixtures are provided in a similar fashion to what the Native American Indians on "A" Facility already enjoy. Memorandums were issued stating that this was our area, but no fencing was erected, no yard maintence equipment was provided to us for the upkeep of that area, and further, Building Five is an "Enhanced Outpatient" Mental Health Housing facility. Essentially what the defendants have done is subjected each and every one of our Holy Gatherings to E.O.P. inmates walking across our assigned area, who in all actuality should not even be on the yard with non- E.O.P. inmates. None of the other five state-sanctioned faiths are exposed to treatment such as the above. Upon

(31.)

information and belief Plaintiff Mr. Cain asserts that this was actually orchestrated to create potential problems for the Asatru-Odinist inmate

1 adherents, (e.g. an adherent let's another E.O.P. Know politely that he's
2 interrupting a religious service, something untoward is said in response, tempers
3 flare, a fight ensues...) Again, none of the other five state-sponsored
4 faiths are so routinely repeatedly exposed to such, and although the above-
5 example of a scenario has never transpired to that extent, that's merely
6 assiduousness on the part of the plaintiff and other Asatru-Odinist inmates.
7 The plaintiff and others should not have to routinely deal with mentally
8 unstable inmates to freely practice their faith with other similarly situated individuals,
9 especially when other inmates who adhere to the five state-sanctioned faiths on
10 the same yard enjoy a higher standard all the way across the board as described
11 supra and infra herein. Defendant's A.W. M. Bunnell, A.W. Y. Page, Captain
12 Knipp, Captain Steel, Lieutenant Cherry, Sergeants Krumwedie and McNeil and
13 Rutherford, Protestant Chaplain Scott Barham and c/o Wilkerson have all stated to
14 plaintiff that the Asatru-Odinist Approved Outdoor area would eventually be moved
15 yet again, eventually... Again, the Native American Indians on Facility "A" are
16 not made to move their assigned areas every six months. The defendants
17 are maliciously perpetrating these repeated moves, not in the interest of safety
18 concerns, but in furthering their campaign of retaliation and dissuasion.
They also are disregardfully ignoring that we build ties with the sacred land

(32.)

where we practice our Holy Rituals, Blöts, Sumbels and Things. Our area was blessed by Steve MacNallen, a leader and pioneer in our reawakened

1 nature-based ancestral religion, and the energy that we both bind with and store on our land (or assigned area) should not be trivialized, denigrated or
2 minimalized. Other similarly situated inmates enjoy a higher standard of
3 respect and professionalism than that and therefore so should the Plaintiff
4 and those of his faith.

5 Nowhere therein in the March 2006 D.O.M. (Departmental Operations Manual)
6 Supplement - § 53050 is our Asatru-Odinist Approved Outdoor Area even mentioned;
7 neither is the Wiccan Approved Outdoor Area. Per that document the Associate
8 Warden of Central Services, Yvette Page, has overall responsibility for religious
9 programs at MCSP.

10 Custody yard staff routinely harass Asatru-Odinist inmate adherents,
11 including Mr. Cain, namely defendants Pogue, Fuentes and Hoover, ordering
12 them "to get away from the back wall" (even though yard crew inmates trim
13 the hedges of that wall all day unsupervised), or telling them that "today
14 isn't your day to be over, here is it? That, when a detailed memorandum
15 outlined each day and the times when we were "approved" to practice on
16 our assigned area, a copy of which hangs in the "A" facility Program
17 Office. This paragraph's occurrences are so routine as to happen on a weekly
18 basis. The Court might take Judicial Notice that just appealing these weekly
comments alone would prohibit filing an appeal in the same seven (7) day

(33.)

calendar period regarding any other unconstitutional discriminatory occurrences;

#2.) by starting unsubstantiated rumors and repeatedly making derogatory and enciteful comments about those who adhere to Asatru-Odinism and Wicca;

Initially, within a week after we were ordered off of our assigned and pre-approved outdoor area on 5-1-05, defendant c/o Wilkerson started a rumor that the Asatru-Odinists on Facility "A" were going to be moved to an area in the center of the back of "A" yard, taking away one of the two horseshoe pits that all inmates on the yard utilized, potentially both of them.

Effectively what this rumor did was label our faith group as the alleged impetus for yet another "privilege" being taken away on "A" yard. Upon information and belief this was knowingly done for no other reason than to malign my religion and it's adherents.

Defendants Yvette Page, Chaplain Scott Barham and Sgt. Krumwedie have all stated that "It's only a matter of time before your group will be moved again", or "They are talking about moving your group behind the Indian lodge or beside the Indian lodge". (The exact dates and times of these statements is contained within my withheld legal property). Further, defendant's c/o Parks, c/o Pogue, c/o Allen, c/o Hoover, Lt. Cherry and others have all either

(34.)

repeatedly made enciteful discriminatory comments, or been present when
such comments were made, such as "You are all just a bunch of devil
worshippers!", "...what? Are you Jewish?", "Look at the Diccans!",
1   the exact date and times of which are all in my currently withheld
2   legal property.

3   Staff have repeated over and over <sup>stated</sup> "You guys aren't a religion, are
4   you?", and the defendants actions in concert only encourage and perpetuate,
5   never counseling or correcting towards tolerance. To the contrary, they have
6   for years now turned a blind eye(s) towards unprofessionalism, blatant discrimin-
7   atory practices and behaviors that do not at all serve the public interest, let
8   alone the common decency of respect. Accordingly the defendants are
9   being sued for such prolonged maleficence.

10   Staff also continue to comment on an inmates wearing of facial hair,
11   although the defendants policy in that regards was amended due to courts
12   rulings in <u>Cutter v. Wilkenson</u> and <u>Warsoldier v. Woodford</u>.

13   The defendants Yvette Page, Mike Bunnell, Roseanne Campbell, Scott Barham,
14   Captain Knipp, Captain Steel, Sgt. Brown, Sgt. Krumwedie, Sgt. E. Rodriquez,
15   Sgt. Espinoza, et al. have abjectly and repeatedly spurned all attempts to
16   promote an open dialogue towards ending this type of discriminatory and illegal
17   mistreatment. The pattern that is and has been the norm remains "one step
18   forward and three steps back", so much so that it is yet another underground
and unwritten department-wide policy;

(35.)

#3.) by making us vacate the multi-faith chapel classroom for no justifiable reason;

1    The plaintiff Mr. Cain's Asatru-Odinist Worship Study Group has held
2  a weekly Runic Study Group for over two years now every Monday morning from
3  8:30 Am to 11:00 Am without a single incident ever occurring. Some twenty
4  or so adherents including the Plaintiff make use of that timeslot for their
5  faith group. Mr. Cain himself and two other inmates teach these weekly
6  worship study groups on various topics- esoteric/exoteric meaning of the runes,
7  theory of various rituals, the Odinic Mind-Body-Soul complex, the Nine Worlds
8  and more. Much of the theory taught in these classes must be learned before
9  one can participate in group ritual/solo ritual workings and rites.

10    Right around October 31st, 2005 the defendants ordered Mr. Cain
11  and the other Asatru-Odinist inmate adherents to exit the classroom at the
12  beginning of their time. To date, various defendants have continued this
13  practice, such as c/o Allen, Sgt. Rutherford, Captain Knipp and Yvette Page.
14  [It's interesting to note that this sudden retaliatory "disallowal" coincides with
15  Rev. Patrick McCollum filing his "class action" lawsuit against C.D.C.R. and others
16  on behalf of "Pagan/Heathen" inmates and himself...]

17    There existed no emergency or incident that made banning our our weekly
18  use of the multi-faith chapel classroom appropriate, considering that the Christians,
the Native Americans, the Muslims, the Jews, the Catholics and the Mormons

(36.)

all continued to attend their classes as scheduled. Only the Khemetic Wiccans
and McCain's group, the Asatru-Odinists, were told they had to leave the
multi-faith chapel classroom. Many times it was inclement weather outside,
1 both raining and cold. Sgt. Rutherford told us "we could study on our
2 land." I informed him that we have tapes we listen to, and that there is
3 no electrical outlet on our approved outdoor area, and that we have books
4 that we all purchased that would get ruined in the rain, and that we
5 should be treated equally to the other similarly situated faith groups. (There
6 are tables, chairs, lighting, a dry erase board and a fan in the multi-
7 faith chapel classroom that all the scheduled faith's classes enjoy and utilize...)
8 On multiple occassions the defendant's totally prevented us from having our class,
9 because of the weather outdoors. The Native Americans have an outdoor area,
10 and they are permitted to utilize the multi-faith chapel classroom once a
11 week. When I attempted to get a memorandum signed similar to the
12 one the Native American inmate adherents had, giving them permission to hold
13 studies with certain designated "Inmate Ministers" conducting them, defendants
14 Scott Barham, Captain Knipp and Yvette Page refused to sign the memo, twice.
15 No reason was given for the refusal. Mr. Cain and two other inmates,
16 Andrew Granger and Ben Harless were listed as the rotating "Inmate Ministers"
17 who would lead the Asatru-Odinist Worship Study classes once weekly. They
18 were/are the same three who conduct monthly Blöt, and who have taught the
class from it's inception. The fact that this restriction (and others) was

never put down on paper, and was only directed at the Asatrú-Odinists and the Wiccan worship study groups, evidences that this restriction not only was

1   arbitrary and purposeless but was also a retaliatory non-neutral purposefully
2   punishing unconstitutional violation;
3

4   #4.)   by never announcing either Asatrú-Odinist or Wiccan worship study
5   classes and or services, instead routinely letting us out late or not at all.
6

7   Continuing their campaign of discrimination, unprofessionalism and unfairness,
8   the defendants never announced our services (Blóts) or study classes over the public
9   address system that was so utilized for all other faith groups scheduled services,
10  studies and activities. This is yet another evidence that the defendants were
11  resolved to attempt to discourage inmates from practicing what they view as
12  unconventional and unpopular (in their eyes) religions, instead of treating them
13  equally in keeping with other similarly situated inmate religious groups. This
14  is yet a further example of a non-neutral arbitrary and purposeless restriction,
15  and one which the court should permissively infer was designed to punish those
16  who practiced Asatrú-Odinism or Wiccan religious beliefs by purposefully always
17  never announcing their Holy Day services, or worship study groups. Inmates
18  of other faiths do not have to "request" that their faith's services are
    announced either, they are automatically announced as if to encourage
    them to attend, while Asatrú-Odinists/Wiccans/Heathens are actively discouraged

(38.)

through a deliberate failure to act. Why the continuing "double-standard"?

Inaction such as the above actually directs staff that the Asatrú-

1  Odinist religion is not to be treated equally with the other five state-sanctioned
2  faiths, after all, they aren't announced like the other five pre-approved
3  faiths are. As a by product of this inducement towards not treating Pagan/
4  heathen inmate adherents equally, the Plaintiff and other similarly situated
5  individuals are more often than not let out late for their Holy Blóts,
6  Sumbels, Things, and worship study groups, sometimes not at all. Specific
7  dates and times of all such occurrences are contained in my currently to-
8  date withheld legal property. Accordingly this Complaint will logically need to
9  be amended once this honorable Court orders the defendants to follow their own
10  regulations.

11      Mr. Cain is made to yell out of his door to get staff's attention,
12  repeatedly, just to explain just why he is to be let out, and for what
13  reason, or get others released as well, over and over and over... The other
14  faiths enjoy a much higher and less restrictive standard than that. As this
15  only affects Asatrú-Odinists (of which classification Plaintiff is) and Heathen
16  inmate adherents, it is logically infered that this arbitrary and purposeless
17  non-neutral restriction is also retaliatory and deliberate by design, meant for
18  punishment for what C.D.C.R. views are unpopular religious beliefs. If the
religion isn't state-sponsored and pre-approved, inmates are actively
discouraged from pursuing that religion as an unwritten policy of C.D.C.R.;

(39.)

#5.) by not signing the memorandums that they require that we have "approved" to freely practice our religion;

2  The defendants require Mr. Cain and those of his faith and other
3  Heathen faiths to generate an inordinant number of "Memorandums For Approval",
4  especially considering that they have denied the Plaintiff's (and others)
5  repeated requests for an inmate chapel clerk of the Heathen faiths general
6  genre, moreso in fact than the other five state-sanctioned faiths combined.
7  As if that fact doesn't shock the social conscience enough as unfair, lately
8  the defendants have added to that "tactic of discrimatory discouragement"
9  by sitting on said memorandums for months and refusing to sign them
10 at all! This illegal behavior coincides with defendant Yvette Page, Associate
11 Warden of Central Services, being placed in charge of overseeing all religious
12 programs... Defendants Protestant Chaplain Scott Barham, Captain Knipp, Lt.
13 Cherry, Captain Steel, Warden Roseanne Campbell, M. Lattimore and others
14 all have participated in what the Oxford Dictionary defines as the suppressing
15 of the "freedom of conscience". "Freedom of conscience" is a system that allows
16 men and women a free choice of religion. The defendants are directing inmates
17 towards certain state-sponsored religions in many ways, and actively discouraging
18 inmates away from non state-sponsored religions in virtually every way imaginable
short of physical violence. It's amazing that in such a behemoth of a State
entity, in as progressive a State as California is, this archiac illegal behavior

(40.)

leading to such abject religious discrimination still lives and breathes
today. This type of discriminatory action bolsters C.D.C.R.'s underground
1  "Code of Silence" and perpetuates "Green Wall"- like criminally illegal
2  behaviors. The defendants claim to want discrimination to stop, but upon
3  information and belief Mr. Cain will prove that they know that this type of
4  illegal behavior creates "tension", "tension" leading to "negative inmate behavior",
5  which itself can be utilized to bolster statistics and provide increased job security.
6  They can also point to it and say "..see, we do need more prisons"!
7        Additionally, although the defendant Protestant Chaplain Scott Barham
8  was actually assigned as our "Sponsor/ Staff" designee in early 2004, with
9  all of the adversarial animosities and bigotries supposibly put aside between
10  Christianity and Asatrú-Odinism (as if that centuries old bias can be put
11  aside) on his part, he has helped foster this total breakdown in dialogue,
12  to the point that on or thereabouts of October 31, 2005 he instructed
13  Mr. Cain's Asatru-Odinist group to "602 him; because I'm (he's) not going
14  to do anything for you anymore". He stated that the body that ordained
15  him "instructed him to do so", or he would "lose his ordination". Defendant
16  Barham never sympathized with Plaintiff's (and other's) difficulties, in fact
17  he posted a sign up in the multi-faith chapel with two faces, one smiling
18  and one frowning. The smiling one said "your life after Jesus..." and
the frowning one said "your life before Jesus". He attempted to make the
Plaintiff Mr. Cain and other similarly situated inmates "frown" as often

(41.)

as he could humanly get away with. A detailed log exists in my currently
to date withheld legal property. Accordingly this Complaint will need to be
1  further amended once this honorable court orders the defendants to return my
2  allowable legal property. The instant pleading, supra and infra, at that time
3  will become much more precise and detailed;
4

5  #6.) by removing the sacred offerings that Mr. Cain and others leave on
6  their "approved" spiritual grounds for the land wights (spirits);
7

8       Mr. Cain and the other Asatru-Odinist inmate adherents often find that
9  the sacrifices and oblations or sacred objects which they have ceremonially left
10 on their grounds have been removed and/or stolen later that very same day
11 by unknown parties.

12     Asatru-Odinism is a nature-based ancestral religion that believes in an
13 underlying, all pervading divine energy that is in reality spiritually interdependent
14 with us - that we effect it, and it effects us. This underlying divinity expresses
15 itself to us in the form of our Gods and Goddesses, the AEsir and the Vanir.
16 We believe that these Gods and Goddesses actually exist and interact with us on
17 multiple planes and levels of physical, mental and spiritual reality. The Disir
18 are female ancestors held sacred by Asatru practitioners, said to always be
present in Holy and Sacred areas watching over us. Many inmate adherents leave
offerings and oblations to the Disir of their clan or Kindred routinely. Asatru

(42.)

mandates honoring one's ancestors, because we are spiritually bonded to them and to our descendants in a sacred folkish way. We know, as evidenced in that

1 they have passed down various physical traits to us, that our ancestors live in us.
2 We also hold that land that we gather on as sacred, calling on the same
3 spirits of the land familiar to the Native American inmate practitioners to ward
4 our approved outdoor stead and watch over us. When staff either take or
5 fail to inhibit others from taking our sacred offerings, sacrifices and sacred
6 objects it's akin to an inmate jumping the fence (that staff erected to provide
7 a barrier for the Native American inmate religious adherents on "A" Facility) and
8 stealing their buffalo skull or a correction's officer eating up all of the communion
9 wafers when no one is around, except that we have no fence or a
10 Catholic Chaplain with a locked office like other similarly situated religious
11 groups on "A" Facility already enjoy...

12 To exacerbate matters further, Mr. Cain and others of "A" Facility's Asatrú-
13 Odinist Worship Study Group have submitted multiple proposals of some detail,
14 so it's not as if the defendants can claim that "Oh, we just didn't know"...
15 Back when Mr. Cain, Mr. Harless and Mr. Granger first met with defendant
16 Chaplain Scott Barham, he stated "Oh, I know all about you guys. I've
17 actually been studying it on the Internet and I even put a proposal together
18 on your behalf". "I'll bring it in tomorrow", he stated. He never did.
Thats two years ago. Same story today...

Lastly, anyone deliberately interfering with an Asatrú-Odinist's sacrifices, offerings or small tokens knowingly or unknowingly is interfering with what

1  Asatruar term their "Orlog" and "Hamingja". ["Orlog" is the unseen relationship
2  an Asatrú adherent has, or spiritual connection if you will, with the collective
3  unconscious of one's folk soul, similar to fate and happiness combined. One's
4  "hamingja" is defined as one's personal luck and spiritual potential.] That's
5  in addition to effectively interfering with Mr. Cain's right to freely practice
6  his religion in ways similar to what other inmates of the other five
7  state-sponsored religions in C.D.C.R. / "A" Facility MCSP already enjoy, utilizing
8  the least restrictive means necessary;
9

10  #7.) by intruding upon our worship study group services, rituals and gatherings
11  merely to harass and make discriminatory comments;
12

13       Just to let the Plaintiff Mr. Cain and those of his faith on "A"
14  facility know that they aren't imagining the discriminatory and harassing
15  meaningless retaliations directed solely at the Heathen inmate community on
16  that yard, defendants Hoover, Pogue, Fuentes, Wilkenson and others
17  would purposefully walk by, stop and step in to search while making
18  comments like "are you guys allowed over here today?", or "do you have
a memo to be over here on you?", or "Today isn't on the list..." (when
it most certainly is or was). It is always immediately obvious that these

(44.)

repeated "goings on" had no legitimate rational, nor were they instigated in
response to an obvious safety and security concern. Again, in the two plus
1  years that Mr. Cain and others gathered together for various Asatrú-Odinist
2  religious functions, there was never a single incident or Rules Violation Report
3  of even the most minor nature surrounding the group, warranting "heightened"
4  and repeated attention by the defendants. Upon information and belief, it
5  really didn't matter that they never found anything in their discriminatory shakedowns-
6  shakedowns that the other five state-sanctioned faith groups sure seem to go
7  through with alot less frequency and fanfare, some not at all.  When it
8  comes to the Asatrú-Odinists and other practicing Heathen inmates, it's comments
9  and searches on the roadway, comments and searches on the approved outdoor
10  area, comments and searches on the way to Mr. Cain's job assignment
11  early in the morning, comments at work by defendant S. Umodu,
12  searches and comments coming out of the chow hall at breakfast, repeated
13  cell-searches, comments and innuendos coming to and from the law library,
14  on and on, ad nauseum.

15      This unconstitutional and discriminatory behavior has taken place in the multi-
16  faith chapel classroom, on the Asatrú-Odinist (and the Wiccan's) approved outdoor area,
17  on the "A" facility track, out front of the "A" facility chapel, at Mr. Cain's
18  educational vocational Graphic Arts assignment, in his housing unit, in the
   "A" facility program office, and elsewhere, and is ongoing as a pattern and
   illegal practice of retaliatory and discriminatory discouragement.  Accordingly

the defendants are being sued;

#8.) by spitting on our approved outdoor stead in front of multiple inmate adherents, thereby deliberately desecrating our hallowed grounds;

Defendant Fuentes approached both Mr. Cain and John Harris (P-72475) on the "A" Facility Asatru-Odinist approved outdoor stead, at approximately (10-31-05) 2:10 P.M. stating "You both are out-of-bounds! What are you doing?". Mr. Harris responded that "We are not out-of-bounds. This is our approved area, and the memorandum is posted in the "A" facility program office"... C/o Fuente's partner c/o Westerbee verified what inmate Harris told him, stating "Yeah, they can be here". (Incidentally, we were quite used to being interrupted like this, mid-ritual, but as you will see, the interruption rises to a "desecration" with one act...) Defendant Fuentes looks Mr. Harris and Mr. Cain, right in their eyes, states "Is that right?" and spits sunflower seeds onto the hallowed ground. Needless to say that effectively ruined our Samhain ritual, preventing us from doing anything but immediately running to fully document said inciteful act. Before he walks away defendant Fuentes informs Mr. Harris that he "will be by his cell later, so that you can educate me", laughing, then walking away. True to his word, at 3:35 P.M. defendant Fuentes had Mr. Harris' cell door popped and stood at the table nearest Harris' open cell door. When Mr. Harris attempted to "educate" c/o Fuentes as to what he was actually doing before he was

(46.)

approached, defendant Fuentes stated "I don't care about any of that! Whats
up with the land"?   Mr. Harris responded "I'd like to know the same thing",
as he produced his copy of the applicable memorandum, showing it to him. Mr.
Fuentes acted like he could care less, all the way around, walking away mid-sentence.
Accordingly defendants are being sued;

#9.) by not erecting or acting to erect a fence around our designated area and
subsequently construct a fire pit as repeatedly promised after being requested
multiple times;

       The Native American approved outdoor stead is both permanent and fenced in
with a firepit on Facility A.  Asatru-Odinists and Wiccans in New Folsom have a
stead erected outdoors, both with a fence and a fire-pit.  There are over eighty
(80) Asatru-Odinists/ Wiccans/ Heathens on A Yard, more in fact than the Native
American inmate population.  Defendants Mike Bunnell, Chaplain Scott Barham,
and Yvette Page all promised that a fence and a permanent area were forthcoming.
We've twice submitted rough plans in the two plus years since our religious group
formed, and even offered to have the fencing donated and perform the required
labor to the extent safety and security permitted.  To date, the constantly moving
designated "approved outdoor religious areas" of the Asatru-Odinists and the Wiccans
both have neither been fenced in, leveled off, supplied with a water source,
had an altar or a fire pit erected, or been given a groundskeeper of their
representative faith's beliefs.  Instead the games continue on a daily basis.

The Asatrú-Odinist Kindred, Mullkaer (meaning "Mule Creek" in Old Norse), that Mr. Cain and inmates Harless and Granger are founding members of,
1 | some twenty inmate adherents in number on "A" Facility, sincerely observes
2 | ancient nature-based spiritual beliefs that the land and their very relationship
3 | to it is sacred. Plaintiff and other similarly situated individuals hold it sacred
4 | to reverently pursue a relationship with the land spirits (wights) of all places
5 | where they practice their religion's rites and rituals, just as their ancestors did
6 | since the beginning of their sacred awareness over 8,000 years ago. It is vital
7 | to Asatrú worship that such sacred places be used only by those of their faith, so
8 | as not to confuse or do harm to the spirits of the land (once invoked and charged)
9 | or to themselves. The plaintiff (and others of his faith) believe(s) in a very real
10 | underlying spiritual energy and presence that, in the form of an all-pervading
11 | energy, exists within all living things - plants, animals, human beings and even in
12 | the land itself. Asatrú-Odinists believe that this spiritual energy is in fact inter-
13 | dependent with them, they affecting it and it affecting them. In order to perform
14 | basic rituals of Mr. Cain's faith when Mr. Cain and others of his faith assemble
15 | for fellowship and to practice their religion a purified grounds must be reasonably
16 | maintained. This outdoor area should be in keeping with institutional security but
17 | still be kept unblemished and consecrated within reason. Asatrú-Odinists hold that
18 | their Gods and Goddesses, the AEsir and Vanir, represent forces of nature and
various aspects of nature itself as a whole, and it is imperative that Plaintiff and
those of his faith be able to commune with them outdoors.

(48.)

The Asatrú-Odinist inmate population of "A" facility highly respects both the Native American and the Khemetic Wiccan inmate religious communities, whom they reside amongst in mCSP, for continuing to hold dear their elder ways and honoring the beliefs of their ancestors. We share many parallels and similarities of belief amongst eachother. Evenso, Asatrú-Odinists like Mr. Cain use precise rituals to forge a very real connection to their Gods and Goddesses, the spirits of the land, and their ancestors called to be present on hallowed ground. This total spiritual bonding provides strength, clarity, direction, a sense of self-worth, a renewal of pride in self and an essential start towards rehabilitating oneself, both during and after such experiences. A single small space outdoors which has an Odinist Altar in the north, a Wiccan Altar in the east, and Native American inmate adherents claiming its "their time" would be nothing more than a chaotic space of near constant disruption, were an inmate such as the Plaintiff herein would be hard-pressed to ever find a single solitary moment of focus or clarity. Mr. Cain mentions the above because the defendants have mentioned placing our faith group's in one area, or all in a single row, or one behind the other. This doesn't make any sense either because the defendants started out acknowledging that we need "space" and in fact provided it to us, but once we asked for equal treatment, well then they began with these nonsensical "concerns". An Asatrú-Odinist's Gods, Goddesses, Land Spirits and ancestors cannot be honored by allowing disruption into a space where they've been invoked for communion and fellowship. That means it is actually against the Plaintiff's religion to create a disruption on

(49.)

sacred ground, contrary to the defendants concerns. In addition to always
claiming to look for alleged contraband (which they never find), one of the ways
1  that the defendants have harassed the Asatrú-Odinist inmates is by constantly
2  stating "we are going to move you again", or by spreading the aforementioned
3  rumors. This becomes even more egregious when Mr. Cain points out the fact that,
4  from 3-19-04 up until 5-1-05, for each and every one of those fourteen months
5  Plaintiff and those of his faith had held monthly ritual gatherings of sorts (given
6  the ongoing problems with ordering basic integral ritual items to this day) on the
7  large unused grass area to the right of the "A" visiting walkway. In fact this area
8  had a direct line of sight from the Yard Tower and the "A" facility Program Office.
9  Again Mr. Cain reiterates that this "pattern" of repeatedly moving our outdoor area
10 is evident. [As of 4-18-06 the defendants by memorandum are threatening to
11 move our assigned area once again, and again claiming to this time "erect fencing".
12 We ask this honorable court to examine the cumulative effect of these repeated
13 occurrences and constitutional violations to date.] Back on 5-1-05, prior to
14 their Asatrú-Odinist "Walpurgisnacht / May Day" gathering getting well-underway, Mr. Cain's
15 entire Kindred was interrupted and confronted and ordered to immediately stop and move
16 to the left of the "A" visiting walkway, for no apparent logic, rhymne or reason
17 whatsoever. Upon information and belief this was done merely to harass and
18 discourage us from following our beliefs. And then, before our next gathering and
   feast of 6-21-05 we were again directed to move, this time to the far back
   corner of the yard in between Building's Four and Five.

(50.)

This type of discriminatory unconstitutional mistreatment mentioned supra and infra has not only tremendously taken away from our positive spiritual evolvement ("our" meaning Mr. Cain and others similarly situated) and our collective group spirit, these acts completely disregard the sincere and vital ties Plaintiff and those of his faith hold with the land on which we hold our gatherings, Blots, rituals and observances on. These repeated retaliatory acts seem to coincidentally coincide with each new rotation of Administrative and Yard/Custody Staff at MCSP. Memorandums signed by previous Captains (who've been rotated) are ignored or declared invalid by the new-to-the-yard Officers and Sergeants, only to have those previous Captains come back again, to again require the same memos to again be generated, all with no clerk of our faith? This is direct evidence of the defendants Knowingly both causing and perpetuating the same violations of Mr. Cain's First Amendment right to freely practice his religion in direct violation of the "least restrictive means" test that R.L.U.I.P.A. outlines and mandates.

   Additionally, the Plaintiff herein points out to the Court that the defendants are abusing the Inmate 602 Appeals System by granting a legitimate grievance's (an appellant) "requested action" only to make them again have to appeal the exact same issue anew in another couple of months... The defendants herein seem to be the ones in need of guidance and constant oversight. All that Mr. Cain ever asked for was to be treated similarly to what other inmates of other faiths have long enjoyed, and to not be singled out for retaliatory discrimination;

#10.) by hindering our faith group's "outside vendor" orders for our twice yearly approved Holy Feasts;

1   The defendants routinely repeatedly require that Mr. Cain and those of
2   his faith request such "outside vendor" orders as many as eight weeks in
3   advance and then purposefully hinder our every effort to gain approval for
4   such food orders. On one occasion our request was either denied or just
5   never fully processed, and on another occassion the check was never sent
6   to the outside vendor, so we never received our "approved" order.
7   Upon information and belief this was deliberately the defendants plan
8   all along, while other faith groups such as the Catholics make a request
9   for pizzas from "Round Table" and three days later they have their pizzas.
10  The "sponsor" overseeing Mr. Cain's faith group, defendant Chaplain Scott
11  Barham, deliberately seeks to actively frustrate and discourage our every attempt
12  to just "be" a faith group. Accordingly, the defendants are being sued;
13

14  #11.) by refusing to copy our study materials for our worship study group;
15  Our "sponsor", defendant Scott Barham refused to copy a periodical
16  entitled "Runa" that I received from him in early November of 2005.
17  The envelope had cat feces on it's outer face, apparently from being
18  "left out at the warehouse" so I asked him to make me one copy
    since whatever substance it was had soaked thru and stained the pages
    and cover with what smelled of urine. He stated "Give me the magazine. —

No problem... I'll do it." When I checked back in with him a week and a half later, he angrily informed me that he couldn't do it, handing it back to me.

The plaintiff herein and another Odinist inmate Ben Harless both received subscriptions to Asatru-Odinist periodicals entitled "Vor Tru" (Our Faith) and "The Saga" that they purchased themselves. Defendant Barham had copied these faith-based materials for the both of us, one copy for each building for our adherents to share, previous to denying Plaintiff's reasonable request in early November, one time. However, that singular time that defendant Barham did so was with such heming and howing as to attempt to discourage us from ever making such a request again. "Oh, they couldn't do it today?"... The law librarian wanting to speak with the chaplain personally, as his signature wasn't good enough. We were told by the S.L.T.A. that we must supply our own paper.

The Muslim inmates have all sorts of literatures, pamphlets and studies copied for all inmate adherents on "A" Facility routinely. The Christian inmates of all denominations have songs, hymns and weekly programs printed out for their entire congregations, in addition to having Bibles available in every building, and a half-dozen stacks of periodicals free-for-the-taking in the multi-faith chapel. Both also have a fully stocked "Multi-Faith" chapel library which doesn't include any Asatru-Odinist / Pagan / Heathen books. Asking for six(6) copies of one or two Asatru-Odinist periodicals to be

copied at state expense, given everything that other similarly situated inmates already enjoy, is far from unreasonable. The fact that the defendants are denying these reasonable requests, along with their other cumulative illegal conducts, is the foundation of the Instant Complaint;

#12.) by not allocating automatically what state-sponsored faith groups already receive and enjoy, instead making us appeal and aggrieve utilizing their illegal appeals system for each and every single thing we request;

Instead of having procedures in place that ask "Do you need copies?", or "Are you and those of your faith group going to need some classroom time?", or "What does your faith need to practice basic rituals?", and just in general attempting to work with those of Mr. Cain's faith's general genre, it is "No, you can't make copies!" - (APPEAL) - "No, you can't make copies." (to the Third Level of Review) - and the a month or so later "Okay, we'll make you some copies"... The above example happens regarding every single reasonable request we proffer as a faith group, from being assigned a chapel clerk of the pagan genre, to requesting classroom time, to receiving religious orders, etc... etc... All these retaliatory instances supra and infra are direct evidence that the defendants do not want to work with those of Mr. Cain's faith and those of other "Pagan/Heathen" faiths to come up with policies that are both fair and non-discriminatory in nature. Accordingly plaintiff is sueing the defendants;

13.) The defendants further discriminated against Mr. Cain and other similarly situated inmates on MCSP "A" Facility by generating a memorandum
1 temporarily suspending all "Pagan" Special Purchase orders as of 10-31-05
2 (to date) instead of acting to address repeated constitutional violations of
3 inmate's rights;

4             Given that both religious books and ordered religious items and
5 artifacts both have previously been allowed, albeit not without sufficient hardship
6 in most cases, the above "faith specific" restriction is not a legitimate response
7 to a penalogical need. The ban was regarding one yard only, not all four yards,
8 and solely directed at "Pagans" of which Mr. Cain is one. The fact that Mr.
9 Cain and others have twice over the past two years submitted an "Asatru-Odinist
10 Proposal" of some detail, only to have it culminate in a suspension/ban on
11 all Pagan religious orders is laughable. This spurious restriction is both arbitrary
12 and purposeless, as the evidence will show, meant as a non-neutral punishment
13 that may not be constitutionally inflicted under the First, Fifth and Fourteenth
14 Amendments to the United States Constitution. There exist no alternative means
15 of obtaining religious items and artifacts, integral items necessary to practice basic
16 rites of his faith. This action constitutes punishment under the Due Process Clause
17 of the Fifth Amendment. The defendants have met our repeated attempts to reach
18 any mutual accommodation with deliberate indifference and discriminatory punishments.
The fact that this 10-31-05 memorandum, along with other illegal acts,
coincided with the class action lawsuit filed by Reverend Patrick McCollum

(55.)

does not appear coincidental. Upon information and belief Mr. Cain asserts that most likely "Pagan/Heathen/Asatrú-Odinist" inmates on other yards at MCSP are
1 already "silenced" under the heavy weight of all these aforementioned goings on.
2 No action of any corrective nature has been undertaken by the defendants to
3 rectify the myriad of "exaggerated responses" despite all the Plaintiff Mr. Cain
4 and other similarly situated inmates have done to make the defendants aware.

5      As to this suspension of all pagan orders, Mr. Cain has been constitution-
6 ally harmed by being denied the ability to purchase ritual specific items for
7 the Samhain, Twelve Nights of Yule, Thorrablöt, Valisblöt, Asynjurblot, Ostara
8 blots and all Days of Remembrance rituals (one each month). Defendants have
9 totally shut down Mr. Cain's ability to practice even the most basic rituals, with
10 integral religiously necessary items and artifacts his faith requires he utilize; These
11 include essential items and artifacts such as the drinking horn, the oath ring, ritual hammers
12 (for individual and group), blessing bowli's (bowls), Evergreen/Ash/Yew sprigs, Sax/
13 Ritual Knife (a small plastic utensil may be substituted by prisoners), the Harrow
14 (Altar), the Gandr (Wand), Rune Sets, Tarot-like Rune Cards, Religious Medallions,
15 Altar Clothes), Casting Clothes), Binding Clothles), Incense, Candles, Herbs, Gemstones
16 and differing small handmade symbols such as horses or figures shaped of bread,
17 paper, straw or the like, many of which represent either sacrificial offerings, or
18 the Gods and Goddesses being honored themselves. Small deity statuettes are used
as well.

     The drinking horn is one of the most integral ritual tools of an Asatrú ritual.

Mr. Cain's drinking from it is the central act of religious observance and symbolizes
one's devotion to the Gods. The term "Minne-drinking" means honoring the
1   memory of the God's & Goddesses and one's ancestral link. The "horn's shape"
2   symbolizes the natural turnings of "Wyrd" (that-which-is) or fate, combined with
3   the Earth in our sacred social ritual, where communication between an Asatrú-Odinist,
4   his Kindred and the Holy Gods and Goddesses takes place in holy communion. The
5   sharing of the draught of the sacred horn amongst adherents symbolizes devote and
6   faithful membership in the holy Asatrú-Odinist worldwide community. It also
7   represents a reclaiming re-integration with our dieties, who for a time many of
8   us were seperated from. Partaking of the sacred mead horn is how our faith's
9   adherents bring forth life changing affirmations, prayers and holy oaths, as well
10  as personal sacrifices. It is an Asatrú-Odinists earthly link to the Weil of Wyrd,
11  whose depths contain the Knowledge and wisdom of "That which is..." (Urd),
12  "That which is becoming..." (Verdhandi) and "All that shall, can or could be"
13  (Skuld). Our holy sacred horn is our eldest holy artifact, having unified our
14  faith's folk from root to blooming flower as long as history itself has been
15  recorded. The defendants have not allowed Mr. Cain or other Asatrú-Odinists
16  to have a horn for either individual or group use to date, which shows their
17  deliberate indifference. Mr. Cain and others have stressed this integral artifacts
18  importance and the need for it, over and over. Other higher-security prisons
    such as New Folsom allow Asatrú-Odinists to purchase and freely use "horns"
    for drinking and ritual use, and have for years. In direct contradiction to

(57.)

the defendants repeated non-action on Mr. Cain's faith group's requests over the course of two years plus, the Native American inmate adherents have an entire

1  buffalo skull with two six inch plus horns sticking out of it, right on their
2  "approved" fenced-in area, where all inmates of their faith have access to it,
3  plus stacks (cords) of firewood, but Mr. Cain cannot have a 6" Hallowed
4  Out Drinking horn? Again the defendants unequal treatment evidences their
5  discriminatory stance. Mr. Cain and other Asatrú-Odinist inmates similarly
6  situated only desire to be treated in parity with what the other five state
7  sanctioned faith groups have long enjoyed.

8     The Oath Ring is another vital ritual tool integral to Asatrú-Odinism's practice,
9  as a sacred holy representation of Troth and Loyalty to one's ancestral deities,
10  and to one's clan and Kindred. It is through the "giving" and the "receiving" of
11  an "Oath Ring" that the "Thane" (student adherent) becomes spiritually connected
12  to his Kindred's "Drighten" (Holy Teacher), one of thee most holy of bonds. An Asatrú-
13  Odinist "Gothi" (Priest) is mandated to wear the Oath Ring at all times whenever he
14  is invoking either our deities, the land wights (spirits) or our ancestors. It is to be
15  both worn and utilized by mandate at all blessings, rituals, feasts, festivals and
16  holy gatherings, and is routinely sanctified by sprinkling it with holy liquid from
17  the mead horn. It is traditionally wooden or metal, carved with runes, and from
18  6" to 12" in diameter, preferably of Yew, Ash, Elm, Oak, Gold or Silver. Mr. Cain
   and other inmate adherents have never been permitted to purchase an Oath Ring
   to date, despite repeated requests. Considering that inmates have access to shovels,
   rakes, picks, soft ball bats, fire, weed-eaters, horse-shoes (metal), lawn movers, etc...,
   (58.)

Common-sense again evidences the defendants deliberate indifference to Mr. Cain's repeated requests.  Mr. Cain and other Asatru-Odinist inmates similarly

1  situated again only desire to be fairly treated in parity with the other five state-

2  sanctioned faith groups  These denials and arbitary non-neutral restrictions

3  are purposeless, serving only to discourage those of a non-state-sanctioned

4  faith from pursuing their religious beliefs.

5          The individual and group ritual hammer(s) represent the warding protective holy

6  might of the God Thor [Thunar] Donner, and they're used to form and guard

7  the holy Asatru-Odinist ritual circle from unfriendly chaotic wights (spirits) &

8  etins or thurses (disharmonious natural spiritual forces of chaos and unevolvement,

9  thereby hallowing the sacred holy ve' (enclosure).  It is the main ritual tool of

10  Asatru worship and equatable to the Christian's cross.  It is made of wood (of the

11  same types as the Oath Ring, preference-wise) or metal, typically from 1½ to

12  3 feet in length.  It should again be noted that firewood near 2 feet in length

13  is provided to other similarly situated inmates an "A" facility.  Metal baseball /

14  softball bats and large digging tools of all types can be checked out on the yard

15  as well.  Mr. Cain's faith groups has neither been provided / to purchase these
                                                                   allowed

16  integral items.

17          The individual and group blessing bowli(s) holds the Gods and Goddesses portion

18  of the Holy draught shared by all present; it is the sacred sacrificial focal point

of the hallowing and always must reside in the center of the Harrow (Altar).  These

blessing bowls must be made of wood, signifying the Asatru-Odinist "creation" story

The Asatrú-Odinist Harrow is traditionally made of stone or wood, and is vital to Asatrú practice and worship. Every ve' (sacred outdoor enclosure) must

1  have one. Given that the Native American's as similarly situated inmates have the
2  basics that they require to practice on their assigned approved permanent outdoor
3  area (a sweat lodge, metal tables, two lockers outdoors, a water source on their area,
4  a fence that locks, a firepit, a garden, etc...) it's a reasonable request for the
5  defendants to treat us equally by constructing an altar/harrow on the appropriate
6  northern location of our assigned area on "A" yard. A table erected would even
7  suffice. All Asatrú-Odinist rituals center around the sacred hallowed harrow, and
8  denying us this necessary bedrock constitutes effectively prohibiting our religion and
9  its rituals. [What the defendants have been doing is allowing Mr. Cain and
10 the other Asatrú-Odinist inmates to utilize a table out of the multi-faith chapel
11 classroom some two hundred and fifty yards from our approved outdoor area, thereby
12 subjecting Mr. Cain and others to a whole host of discouragements, such as,
13 carrying a table thats 80 lbs. 500 yards for each time it's used, putting up with
14 the comments that go along with sometimes needing to get the door unlocked,
15 comments from the other faith's clerks whose congregations use/need the table too,
16 etc... Putting up with this mistreatment is not acceptable, given that inmates of
17 the other five state-sanctioned faiths aren't put through it to freely pursue their
18 faith. The Native Americans don't carry their table, it is erected permanently on

their assigned outdoor area, and they do not share their table with other competing faith groups. Taking something earmarked for one religious group and

giving it to another religious group is deliberately devisive and antagonizing, in addition to being unequal treatment.] For in-cell ritual use, a small

1 carved plate of wood 12" in diameter that can be placed upon a desk, bed,
2 or footlocker is required. According to our sacred lore, that which is holy
3 should never be used for the everyday and the mundane. These repeated requests
4 by Mr. Cain and others similarly situated have never been addressed.

5     The Gandr (wand) is another vital ritual tool used in everything from rituals to
6 blessings; it symbolizes combining one's holy will with the invoked power of
7 All-father Odin (or other deity) out of all the eight corners of the nine worlds.
8 The wand should be made of wood, and it's diameter should be no smaller than
9 one's index finger but not larger than 2½" in diameter. It can be from 6" to
10 2½ feet long. The size of up to 10" × 3/4" is widely accepted in prison
11 settings nationwide, with the back end blunted and the tapered forward tip rounded
12 slightly. Runes are often engraved on these necessary religious tools. As with
13 every other "item" listed supra and infra within this Complaint, the defendants once
14 again just arbitrarily pulled some measurements out of thin air, stating in their
15 latest "MCSP D.O.M. - § 53050 - Religious Programs" revision that "wands may be
16 ½" in diameter for group use and ⅛" for personal in-cell use. (⅛" diameter is
17 smaller than a pencil in diameter, which every inmate on "A" yard is allowed...)
18 This will the Native Americans have a "Staff of Life" stuck in the ground on
their area thats 3 feet long and at least 3/4" in diameter, probably more. Our
beliefs are almost identical in many respects, both being nature-based ancestral

(62.)

religions.   Why such disparate and unequal treatment, if not to discriminate and discourage?

1   Plaintiff Mr. Cain is fairly certain that this widespread deliberate
2   "pattern and practice" of discriminatory game playing, retaliation and bad
3   faith will not be difficult to bring to light.

4   "Rune Sets" also play a central daily mandatory ritual part of an Asatrú-
5   Odinist's religious observance.   Four different sets, comprised of between 16 & 33
6   runestaves, individually symbolize myriad aspects of "self", natural patterns that
7   underlie and echo in both the substance and the unknown of the multiverse,
8   constituting its being, its becoming and its dissolution.   Far more than four systems
9   of ancient writing, these runes teach one about his/her past history, culture and
10  heritage.   They are studied numerologically, by their ideographic value, phonetic auditory
11  aspects in ritual, symbolic esoteric and exoteric content and used in divinitory
12  rites by sole practioners and groups alike.   They are cosmological focal points
13  of energy and substance in the cosmic framework of the Nine Worlds, and
14  they compromise the link between all streams of energy, matter and being,
15  and the Gods and Goddesses.   From their use in meditation to just discovering
16  one's true spiritual path, the Plaintiff could write volumes about their
17  significance.   Asatrú-Odinists like Mr. Cain and other similarly situated
18  inmates on Facility "A" at MCSP are actually required by their sacred
    lore to cut, shape, carve and stain their own runes sets as a basic rite
    of their faith, before charging the vital energy into each stave or tine.

These rune sets can be of varying shapes, made from wood, bone, antler, glass or stones. Pieces of pre-cut tree branches or wooden dowels from ½"
1 to ¾" in diameter of ¼" thickness should be permitted for procurement.
2 Certain types of hand crafted runestaves are necessary for specific rituals and
3 ceremonies. Regardless of the materials used to create one's rune set, it
4 is mandated that we construct our own set of runes charged with our own
5 energies. The defendants assert that the colors "red" and "blue" are not
6 permitted. Mr. Cain disputes that as his sacred lore demands that the color
7 "red", symbolizing "blood" (and actually calling on the plaintiff to mix his own
8 blood into the ink/stain/pigment by knicking his finger), and the color "blue"
9 symbolizes healing and peace, so it would be called for in rituals of that
10 nature. The defendants also are wrong in stating that this artifact needs to
11 be one color, "white". In fact they should be of varied natural color, as
12 each rune has a corresponding color, herb and tree.

13       "Religious medallions" including the required wearing of the Mjollnir/
14 Thor's Hammer necklace worn by all Asatrú-Odinists is an ancient practice symbol-
15 izing and signifying one's allegiance to the Aesir and Vanir. Other sacred symbols
16 of Mr. Cain's faith include medallions in the shape of the "Valknot", the Tryfolt
17 or Triskelion, various Bindrunes, the sunwheel, or totem animal representations
18 such as the wolf, raven, bear, boar, etc... The plaintiff Mr. Cain and other
similarly situated individuals should not be limited to just one such medallion
for ritual use, as many are rite-specific. A more reasonable allowance would

(64.)

be three (3).   At that number, four inmates could coordinate a medallion for the twelve monthly rites.   The current regulations governing such are overly

1  restrictive and do not consider Mr. Cain's religious needs, or those of similary
2  situated individuals of Mr. Cain's faith.

3      Mr. Cain and other Asatrú-Odinist inmate adherents require "herbs" and
4  "fragrant oils—incense—tobacco" for their ritual use.   The defendants have never
5  attempted to sit down with Mr. Cain or any representative of his faith group
6  in the attempt to "approve" a list for such.   The list of available approved oils
7  the defendants here at M.C.S.P. have recently updated doesn't include any of
8  the oils we require for basic rituals.   For a time the defendants permitted
9  the purchase of stick and cone incense for in cell use but have arbitrarily
10  ceased doing even that.   That's unnecessarily restricting yet another element of
11  Mr. Cain's religious practice.   One of the things Mr. Cain and other Asatrú-Odinist
12  inmate adherents on "A" yard got into the ritual habit of doing back in early
13  2004, at the Native American's informal prompting, was sacrificing tobacco to
14  the land wights/spirits in addition to food and drink, recognizing that it had
15  long been the custom of the Native American inmate adherents who share the yard
16  with them.   In our sacred lore it is stressed that the spirits of the land always
17  receive what they are accustomed to, with a holy reverent courtesy and an
18  aware natural respect, in order to avoiding both individual and group damage

to "Orlog" and "Hamingja" (Fate and luck, respectively...), not to mention
dishonoring oneself and ones ancestors, whom the spirits of the land are

(65.)

connected to. Mr. Cain has never been permitted to procure small amounts of ceremonial tobacco for such routine offerings, nor has anyone of his faith

1 group on "A" yard. This denial and purposeless restriction has harmed us, and
2 it is non-neutral in its imposition since the Native American's inmate religious
3 usage has not been thus restricted. In yet another way Mr. Cain's aforementioned
4 constitutional rights are being violated.

5 "Gemstones" are utilized in Asatrú-Odinist Ritual as well, charged for
6 ritual purposes to represent various runic correspondences or even to symbolize
7 a natural force itself.

8 Mr. Cain points out to this honorable court that being able as an
9 inmate at MCSP to order or procure the aforementioned ritual tools is a vital
10 part of being able to freely pursue and practice one's Heathen/Pagan faith.
11 Some of these ritual tools have been temporarily allowed in for past rituals,
12 although at every step of the way Mr. Cain and other similarly situated individuals
13 have experienced a virtual daily campaign of discriminatory and unprofessional
14 game playing in what appears to be a concerted effort to discourage them from
15 following their beliefs. With this suspension of all "Pagan" Religious Special
16 Purchase Orders as of 10-31-05 the defendants have worsened that reality another
17 step forward. This is blatant discriminatory retaliation, plain and simple, more
18 games and nothing more. Accordingly the defendants are constitutionally
harming Mr. Cain and others similarly situated;

(66.)

#14.) The plaintiff is effectively cut off from his religion while housed in Administrative Segregation, as the direct result of being more severely punished than what other inmates on "A" yard receive for substantially similar infractions;

The Defendants Captain Arnold, Sergeant Brown, Sergeant E. Rodriguez, Sgt. Krumwedie, Protestant Chaplain Scott Barham, Acting Warden Sylvia Garcia, E.A. Reyes, L.B. Reeves, K. Baker, C. White, Lieutenant J.K. Rayel, and Correctional Officers Montanez, Mendez, Makobson, Nelson and R. Dion, acting in concert have effectively cut me off from my religion and it's practice by denying my repeated requests while housed back here in Administrative Segregation for some 108 days now for a religious book, pamphlet and study guide out of my personal property. My repeated requests to be re-issued my religious Mjollnir pendant have also all not been acted upon. Inmates back here in Ad-Seg are routinely given their Five State-Sanctioned Faiths religious books-pamphlets-study guides and their religious pendants (i.e. Gold crosses, Gold Chains, Medicine Bags, etc.m), while I am retaliated against by having my requests denied and unacted upon, over and over. Twenty two (22)[+] requests for religious accomodation have gone unresponded to thus far, and that is counting a sign that was placed in my front cell door window on 5-22-06 (and has been there since) as one request.

Bibles and Korans are routinely offered to inmates in Ad-Seg. No books of my faith are available, either to be passed out by staff or contained in the inadequate satellite library which will be discussed later.

(67.)

1 I've been housed in Ad-Seg since 3-28-06, over one hundred and fourteen
days now, as the direct result of being more severely punished than what other
2 inmates on "A" yard receive for substantially similar infractions - inmates with prior
3 histories (this was my first offense) and more aggravating circumstances at that.

4  I've made over a dozen written requests for my allowable religious
5 books and pendant while housed in Ad-Seg, and as many verbal requests. In
6 fact a sign that I made has been in the front window of my cell-door ever
7 since 5-22-06. Staff of all sorts routinely make fun of my non-accomodation.
8 I keep a log of exactly who says what. Staff of all descriptions blatantly refuse
9 my repeated requests for accomodation.

10  I have not been given advance notice of any committee action, and I
11 have been taken to four committees since I've been in Ad-Seg. They have failed
12 to provide me an updated California Code of Regulations, Title 15, and/or copies of
13 the 128 G Chronos of the committees actions in regards to me. The latest retaliation
14 Mr. Cain has experienced is being put up for a transfer in retaliation for being
15 an outspoken class representative for the Asatrú-Odinists. Additionally, Mr. Cain,
16 the Plaintiff herein has recently discovered that much of his personal property is/
17 was lost or missing or illegally siezed or unlawfully donated without due process
18 of law. The message that the defendants have sent is crystal clear, if this
is the religion you want to follow, this is the treatment you will receive.
Accordingly this Complaint arises.

(68.)

D. Issue #4 — Prohibiting Asatrú-Odinist/Pagan/Heathen Inmates From Purchasing Any Soft-Cover Books In Administrative Segregation Violates Both The First and Fifth Amendments To The United States Constitution, As Well As The Fourteenth Amendment.

In addition to not allowing me my allowable religious books out of my personal property stored in the Ad-Seg Connex, the defendants do not permit me to order any books while so housed. This restriction of course includes Asatrú-Odinist/Pagan/Heathen books. This unlawful restriction is an exaggerated response to a legitimate security concern, and does not meet the "least restrictive-means" standard set forth in R.L.U.I.P.A. ((Religious Land Use and Institutionalized Person Act), 42 u.s.c. § 2000 cc, et seq.)

Denying Ad-Seg inmates at MCSP the ability to purchase soft-cover books at all takes the "Publishers Only Rule" to another level. There exists no alternative means of obtaining religious reading materials in Ad-Seg for Mr. Cain, where stays can range from ninety days to an indeterminant term of confinement, as the maximum period. All of Mr. Cain's repeated requests have gone unanswered or unresponded to, each and every time he requested religious accomodation.

This arbitrary restriction was designed for punishment, and acts in a non-neutral fashion that prohibits non-five faith inmates from purchasing their religious texts, while Bibles and Korans are available upon request. This purposeful illegal governmental action constitutes "punishment" under the due process

(69.)

Clause of the Fifth Amendment to the United States Constitution
1 It also violates the "Free Exercise Clause" of the First Amendment to the
2 United States Constitution.

3     The First Amendment to the Constitution protects the "free exercise" of
4 religion, and the U.S. Supreme Court has held that reasonable opportunities must be
5 afforded to all prisoners to exercise the religious freedoms guaranteed by the
6 First and Fourteenth Amendments to the U.S. Constitution without fear of penalty.

7     The Fourteenth Amendment to the U.S. Constitution forbids a state to deny
8 any person within its jurisdiction the equal protection of the laws. The Fifth Amend-
9 ment requires the Federal Government to obey the same equal protection standards as the
10 states. "Equal protection" forbids discrimination or unequal treatment that is unjustified.
11 The defendents discriminatory conducts have no rational relationship to a legitimate
12 penalogical perpose, and they don't stand up to the requirement needed to show
13 that their actions or practices are necessary to serve "a compelling state interest
14 by the least restrictive means available" and both "religious preference" and
15 "national origin/race" are suspect classes activating such standards.

16     Even Corcoran S.H.U. and Pelican Bay S.H.U. Facilities allow inmates
17 to purchase books, and they are the most restrictive highest security prisons in
18 the state.

     Thereby mr. Cains rights under the First, Fifth and Fourteenth Amend-
ments to the United States Constitution have all been violated. Accordingly this
Complaint Arises.

E. <u>Issue #5</u> — The Five State-Sanctioned Faiths Policy Is Unconstitutional on Its Face and Is Discriminatory on Its Face and As Applied.

The Five State-Sanctioned Faiths Policy subjectively and unconstitutionally favors five religious faiths - Protestant, Catholic, Jewish, Muslim, and Native American - and therefore results in unlawful discrimination against all other faiths. The effect of this policy is pervasive, long embedded in MCSP and is manifested itself in MCSP's religious accomodation policies, in the discriminatory practices towards non-five faith inmates and their volunteer clergy, the actions and ommissions of Defendants and other CDCR employees directed towards inmates and volunteer clergy alike, and in the minimum qualifications for paid chaplaincy positions, which require that paid prison chaplains be one of the five faiths.

The Five State-Sanctioned Faiths Policy creates an unequal two-tiered system of sponsored religions and unsponsored religions. State chaplain positions are limited at MCSP and statewide to Five State-Sanctioned Faiths clergy; Asatrú-Odinist/Pagan/Heathen clergy and clergy of all other faiths at MCSP may only become volunteers, and then only if approved by the institution. Approval at MCSP is obstructed and often denied without cause. Paid state prison chaplains have state funding for religious services and artifacts, five days a week access to inmates, and intangible benefits associated with their official status. Volunteer clergy and the inmates they serve at MCSP and statewide do not have access to any of these benefits and privileges. These differences are the product of discrimination, not based on objective, content-neutral criteria.

The discrimination against the Asatrú-Odinist/Pagan/Heathen Plaintiffs and others

(71.)

similarly situated that pervades MCSP and the CDCR derives its unconstitutional spirit

1   from the failure of the CDCR and MCSP Administration to provide chaplaincy services to them,
2   like the Five Faiths Inmates enjoy. Inmates adhering to one of the Five State-Sanctioned Faiths
3   receive far greater levels of daily religious accomodation than does the Asatrú-Odinist/Pagan/
4   Heathen inmate population at MCSP, as the direct result of state-sponsorship of Five State-
5   Sanctioned Faiths chaplains. Chaplains of the Five State-Sanctioned Faiths at MCSP, like
6   Defendant Scott Barham, are often hostile and deliberately unaccomodating to Asatrú-Odinist/
7   Pagan Heathen inmates at MCSP, yet they are assigned knowing as much by their superiors
8   to oversee Asatrú-Odinist/Pagan/Heathen religious life because of the absence of Wiccan
9   or Asatrú-Odinist/Pagan/Heathen chaplains. The defendants would ask this court to believe
10  that all of our accomodation requests are insincere, unreasonable and disruptive,
11  but the Plaintiffs are confident that they can show that that is just simply not the case,
12  Our assigned sponsor, Defendant Barham, a Five State-Sanctioned Faiths Protestant
13  Chaplain is and has been discriminating against the Plaintiffs and other similarly
14  situated Asatrú-Odinists for some time now, blatantly and openly prioritizing the needs
15  of the adherents of his own Christian faith above the needs of the Asatrú-Odinist Plaintiffs
16  and other similarly situated inmates.

17      Inmates at MCSP who do not subscribe to the Five State-Sanctioned Faiths,
18  including the Asatrú-Odinist Plaintiffs and others similarly situated, are at present
    once or twice a year served by volunteer clergy, who have nowhere near the same
    authority to provide services and accomodations as do paid prison chaplains, or are not
    served by any chaplains at all. The Plaintiffs and others similarly situated are

(72.)

denied the multiple benefits and privileges of state sponsorship, with no objective

justification, such as custody or security, for such arbitrary denials. The Plaintiffs

and others similarly situated have restricted access to the multi-faith chapel or other spaces

designated for conducting services, to clergy, to funds for religious activities and religious

objects, to time off of work for religious holidays and services, and to religious

counseling that is wholly disproportionate to that of the other Five Faith inmates. This

pervasive discrimination at MCSP and throughout CDCR is unconstitutional, and the

widespread limitations this unequal treatment imposes on the Asatrú-Odinist/Pagan/Heathen

Plaintiffs and others similarly situated comes as a byproduct of the unlawful discrimination

against them, not due the product of a content and class-neutral compelling govermental (sic)

interest.

    The continuing implementation and adherence to the Five State Sanctioned Faiths

Policy results in a substantial burden on the free exercise of religion of the Asatrú-Odinist/

Pagan/Heathen Plaintiffs and others similarly situated. In addition, as applied, the policy

literally creates a thriving culture of unlawful discrimination unchecked amidst a "code-

of silence", this being unconstitutionally harmful against the Plaintiffs and other similarly

situated inmates, who are quite effectively deprived of the benefits and protections

enjoyed by inmates practicing state-sponsored religions.

    The Religious Program Policies at Individual Prisons Reflect the Discriminatory
Nature of the CDCR Five State-Sanctioned Faiths Policy Statewide.

    The CDCR Departmental Operations Manual ("DOM") regulates religious programs at
MCSP and Statewide. It lists seventeen ways that reasonable accommodations should be

(73.)

made for all inmate faiths. The DOM also approves Kosher diets and Christian

1   Religious Artifacts, and regulates the provision and use of sweat lodges. The DOM does

2   not address religious services, religious artifacts or religious texts for the Asatrú-Odinist/

3   Pagan/ Heathen or Wiccan Faiths at all. Not one word...

4        The Warden Roseanne Campbell, Defendant, and those under her charge have

5   the authority to enact a regulatory supplement to the DOM, which restricts or expands

6   the religious programs section set forth in the DOM. Campbell has been informed and knows

7   that "inmate needs" require that an expanded regulatory supplement should be drafted for

8   over two years now. These regulatory supplements are also enacted as Operational Procedures.

9        Supplements to the DOM logically should reflect and incorporate issues and

10  accomodations that the institution's inmate population requires, but MCSP's instead,

11  like institutions statewide, reflects and incorporates the discriminatory nature of the Fire

12  State-Sanctioned Faiths Policy itself. It appears that MCSP's supplemental religious programming

13  regulations have been purposefully drafted and enforced in a deliberate manner so as to

14  exclude Asatrú-Odinist/ Pagan/ Heathen religious artifacts, not list vendors who supply such

15  artifacts and religious texts, limit Asatrú-Odinist/ Pagan/ Heathen services (by preventing

16  them from having the basic integral religious tools to practice their faith), deny religious

17  accomodations to the Plaintiffs and others similarly situated, and severely restrict-

18  hamper and obstruct their free exercise of religious rights. Such discriminatory

policies are tolerated by the CDCR, encouraged to continue by an unspoken "code-

of silence."

      Section 5009 of the California Penal Code provides that all state prison inmates

(74.)

shall be afforded reasonable opportunities to exercise religious freedom. Defendant
Campbell, Warden of MCSP, is obligated under the California Administrative Code to
make "every reasonable effort to provide for the religious and spiritual welfare of all
interested individuals and groups of inmates."

   Under the statewide Chaplaincy Program of the CDCR, the CDCR has hired
prison chaplains since 1931 to accomodate the religious freedoms of prisoners. The position
of chaplain is a civil service classification created by the SPB. There are, and for
all times relevant to this lawsuit have been, five chaplain civil service classifications per
the Five State-Sanctioned Faiths Hiring Policy: "Catholic Chaplain", "Protestant Chaplain",
"Jewish Chaplain", "Muslim Chaplain", and "Native American Spiritual Advisor". Job applicants
for these positions are segregated by faith, and minimum qualifications for these
positions select and limit applicants by faith. This system has no mechanism to hire clergy
of any other religious denomination whatsoever.

   There are no objective criteria that are applied, without regard to the content of a
religion, to determine which religions will have chaplains or what other types of accomodations
should be provided to the Plaintiffs and other similarly situated individuals. Instead there
is pervasive discrimination in favor of particular faiths with no objective non-neutral
justification for the manner and means by which clergy of particular faiths and the extent
and the extent and manner of other religious accomodations are selected and no ongoing or
evolvement-based review and adjustment of the policy to address a changing religious
world view, changing demographics or other factors in the CDCR. The CDCR chaplaincy
program's five chaplain civil service classifications were not even instituted in a reasonable

manner based on objective criteria designed to serve the religious preferences of the inmate

1  population. The CDCR initially decided in 1957 to limit positions to Catholic, Protestant,

2  and Jewish, pre-Civil Rights Movement. The decision to add the classification of Muslim

3  Chaplain in 1981 was made by stipulated judgement in a lawsuit involving the provision of

4  Muslim faith services. The decision to add the classification of Native American Spiritual

5  Advisor in 1989 was made by stipulated judgement after Native American inmates sued

6  to obtain funding for Native American religious programming in parity with other recognized

7  religions. When last surveyed in 2002, Wiccan inmates alone, excluding any other

8  "Pagan" faiths and excluding all inmates hiding their religious beliefs out of fear of discriminatory

9  retaliation and mistreatment in the prison system, still numbered in the hundreds and

10  outnumbered Jewish inmates by two to one. The National Prison Kindred Alliance (N.P.K.A.)

11  lists over twenty-five Asatrú-Odinist/Pagan/Heathen Prison Kindreds ("Groups") in CA

12  prisons alone, statewide. So MCSP/CDCR does not sponsor a single state Asatrú-Odinist/Pagan/

13  Heathen (or Wiccan) chaplain, but employs at least three Jewish Chaplains. A religious

14  designation that should have six paid Chaplain positions gets none. The CDCR policies

15  contain provisions allowing chaplains access to prison facilities to minister to inmates on a

16  volunteer basis, on paper that is. On information and belief, volunteer chaplains of the Five

17  State Sanctioned Faiths are eligible and receive per diem payments from the CDCR to offset

18  the cost of travel and lodging for these services. Non-Five State Sanctioned Faiths volunteer

clergy do not receive this benefit, and so are further discouraged (rather than encouraged)

from volunteering.

(76.)

The Facts Supporting the Specific Allegations of the Asatrú-Odinist/
Pagan/Heathen Plaintiffs and all other similarly situated Inmates at MCSP.

   The Asatrú-Odinist/Pagan/Heathen Plaintiffs and other similarly situated
inmates at MCSP are experiencing ongoing and systematic repeated discrimination
under the Five State-Sanctioned Faiths Policy, combined with the added MCSP's unlawful
underground misuse of the CDCR 602 Inmate Appeals system, by the Warden, the
Associate Wardens, Captains, Sergeants, Corrections Officers, the Protestant Chaplain and
other Administrative Staff. In addition to experiencing such overt discrimination ongoing for
years now, in many cases the plaintiffs and others similarly situated have been and continue
to be actively prevented from practicing their religion and in other cases their ability to
practice their religion has been substantially burdened. Mr. Cain has made multiple requests
to meet with a Pagan chaplain in general, and with Patrick McCollum in particular.
These requests were regularly denied as part of the overarching widespread discrimination
against the Asatrú-Odinist/Pagan/Heathen inmate population at MCSP. Mr. Cain is
now housed in Administrative Segregation as the direct result of retaliation for being
the one always "pushing paperwork", himself being more severely punished than what others
with substantially similar infractions receive, and now the Administration is threatening a
transfer to boot.

   This overt and blatant discrimination at MCSP against the Plaintiffs and others
similarly situated further serves to intimidate the class into denying and/or hiding their
religion rather than subject themselves to such harassing and petty repeated overt discrimination
practices.

(77.)

By hindering, obfuscating, delaying and discouraging access to administrative
1 | channels of redress within the institution and by intimidating the Plaintiffs and others
2 | similarly situated with their pervasive and systematic climate of discrimination against
3 | the Plaintiffs and all others similarly situated, the Defendants also are deliberately hindering
4 | the Plaintiffs and all others similarly situated from seeking to enforce their rights and pursuing
5 | individual redress against the Defendants.

6 |     Under the antiquated auspices of the Five State-Sanctioned Faiths Policy on its face
7 | and as applied by Defendants, the plaintiffs have experienced discriminatory and unequal
8 | treatment and retaliation in all ways described herein supra and infra. Further,
9 | Plaintiff Cain is now housed in Ad-Seg, effectively cut off from his religion and his
10 | practice, and still the retaliation not only continues, it intensifies. This discriminatory
11 | and unequal treatment includes but is not limited to:

12 |     (a) denial of access to clergy, religious services, religious rites and religious
13 |         literature;

14 |     (b) confiscation, loss and/or destruction of religious books and artifacts;
15 |     (c) total denial of any access to funds for religious activities;
16 |     (d) denial of adequate and reasonable access to time off work or school
17 |         for religious holy days or worship study services;
18 |     (e) total denial of on-site religious counseling in times of personal crisis,
        such as a death in the family;

    (f) subjection to ridicule by unprofessional staff, humiliation and derogatory
        and stigmatizing treatment, including false and inciteful statements

regarding plaintiffs' religion, character, and deity;

(g) unconstitutional and unequal treatment and retaliation rife in the administrative "602" grievance process;

(h) picking and choosing whom the defendants want to punish, and then carrying out more severe punishment than other inmates receive for substantially similar infractions;

(i) altering and falsifying and ommitting documents out of Plaintiffs Central Files, Disciplinary Reports, and Informational Chronos;

(j) threats of violence and damage to ones person and/or property based on religious preference;

(k) differential, disrespectful and disdainful treatment of the Wiccan/Asatrú Pagan Inmate Class and their religious items as a widespread practice;

(l) hindering and obstructing plaintiffs' meaningful access to the courts.

The Asatrú/Odinist/Pagan/Heathen Plaintiffs have grieved to the MCSP institutional defendants without success issues including but not limited to:

(a) retaliation based on the exercise of religious beliefs;

(b) discrimination based on religious beliefs;

(c) illegal grooming standards policies, practices and procedures;

(d) confiscation, desecration and destruction of religious accoutrements and spiritual artifacts;

(79.)

1    <u>F. Issue #6 -</u> Obstructing and Impeding Mr. Cain's Access To The
2    Courts By Withholding Legal Property, Losing and Seizing Legal
3    Materials, and Providing Him With Minimal Access To An Inadequate
4    Law Library, and more...

5

6    Upon information and belief, what follows is all part of the defendants
7 plan and method to defend against the continuing illegal activities by
8 frustrating and discouraging legitimate inmate lawsuits.
9    In the defendents campaign of reoccurring discriminations and
10 retaliations, they have both lost or misplaced most of my legal property,
11 unlawfully donated my legal books without my consent or permission, and
12 I believe that they have deliberately siezed these materials, at least in part,
13 to deliberately retaliate against me for filing administrative appeals,
14 Administrative Notices of Law, and for being an outspoken class representative
15 in my elected capacity as the Chairman of the Religious Subcommittee For
16 the Men's Advisory Council on MCSP's "A" Facility.
17    After being "set-up" and sent to Ad-Seg on 3-28-06 the games began.
18 [The specifics of this particular issue have not been "administratively exhausted" as
of yet, nevertheless the Plaintiffs' wanted this Honorable Court to take Judicial
Notice that these events are happening as this Complaint is being processed.]
These unfolding unlawful events and the fact that Mr. Cain is still seperated,

(81.)

perhaps permanently, from three quarters of his legal work and legal property,
should explain any apparent vagueness of this initial pleading, as to dates,
times and names. Mr. Cain does have copies of all missing items for the
most part, and will eventually receive them / retrieve them from where they were
stored, outside of these walls; at significant trouble and expense albeit.

The defendants have housed me in C-12-232 on the upper tier, amidst
E.O.P. (Enhanced Out-Patient) mentally-ill patients who bang, scream, talk to themselves
all day, and yell at the top of their lungs.

Unknown defendants have taken stamps out of my incoming mail,
withheld blank white paper that came in my incoming mail, lost or misplaced
exhibits I was labeling for this lawsuit, lost or misplaced half of my pre-approved
pre-paid Blackstone Paralegal Course Books and materials, lost or misplaced and/or
unlawfully "donated" legal books that I had purchased thru my family, and staff
across the board are making it known that they are doing so purposefully. Associate
Warden Sylvia Garcia made a comment in my last classification committee that (she)
"wants what I say recorded and written down, so when (she's) sued in three years".
When other inmates in Ad-Seg get extra food, I never get extra food. Sergeant Brown
has repeatedly threatened me. Sergeant Krumwiede has threatened me. Associate Warden
Mike Bunnell's exact words to me at the meeting in June of 2005, regarding the first
Administrative Notice of Law that I/m's Harless, Granger and I served on the defendants,
whom are Plaintiffs in this action, were "I don't give a fuck! You will learn about
how I do things here." I'm as sure that all of these coincidences involving

multiple staff on multiple yards are "retaliatory" as I am sure that the sky is

1  blue,

2      On 7-25-06  c/o R.Dion came to my cell at 14:00 HRS and stated that

3  "Sergeant Rodriguez has made You my pet project!"

4      Since 3-28-06 these statements, comments and petty, yet constant,

5  retaliatory actions have become the norm, Despite my repeated verbal, written

6  and appeal requests from the outset of initially being housed in Ad-Seg, Defendent's

7  Lt. J.K. Rogel, Sergeant E. Rodriquez, C/o L. Montanez, C/o Mendez, C/o Makobson,

8  L.B. Reeves, E.A. Reyes, K. Baker, C. White, and others have conspired to keep

9  me from accessing my legal property, all but totally. After over ninety days

10  of repeated requests I was allowed only one half hour with approximately a little under

11  one third of my legal property. At that time I was told that "this is the one and

12  only chance you'll get to go thru your legal property", as if taunting me. Defendant

13  Montanez told me that. He has kept his word too.

14      The law library back here is wholly and deliberately inadequate as well. There

15  are no listings for either available books or forms posted in the three small cages

16  available for use. The law librarian is frequently absent. Inmates without a

17  30 day deadline are only afforded one to two hours of access, every week or two.

18  That, in and of itself, is not enough time to do even cursory research, and that is

IF about 30 basic books were there, that aren't. Further, the books that are

available are both outdated and often missing whole sections of material.

(83.)

The defendants' have begun to falsify and destroy and/or remove documents from Mr. Cain's Central File in the attempt to justify their retaliations and unprofessional discriminatory mistreatments. Falsifying, or destroying, or altering or removing state documents is a crime under State Law.

The defendents' may not retaliate against the Plaintiffs' for seeking and obtaining access to the courts - whether the retaliation takes the form of losing property, or witholding books and materials or privileges does not matter. Transfers, confiscation and mysterious yet blatant loss of legal materials, unlawful seizures of personal property, exclusion from programs, conspiratorially planned disciplinary actions, threats, intimidations and harassments, all constitute retaliation,

The U.S. Supreme Court itself has stated that it is now established beyond doubt that prisoners have a constitutional right of access to the courts. Courts have cited the Due Process Clause, the Equal Protection Clause, the First Amendment, and the Privileges and Immunities Clause of Article IV of the United States Constitution as the bases for that right. Accordingly Mr. Cain's rights to the above have been violated by the defendants, and this Complaint arises.

Further, Mr. Cain has a state law liberty interest in avoiding punitive / retaliatory transfers as an inmate class grievance representative. It should be noted that the second choice for transfer endorsement that the defendants chose for Mr. Cain was Salinas Valley State Prison, the home of the now infamo "Green Wall" gang of corrections officers. What message does that send?

G. Issue #7.- Taking Yard And Exercise As Punishment
For Rules Violations Reports and Disciplinary Infractions
Violates The Eighth Amendment.

The defendants have threatened to "write me up" back here in Administrative Segregation and "take my yard". Both Plaintiff Cain (myself) and Plaintiff Harless have recently had their "yard" taken as punishment for disciplinary infractions, the defendants labeling outdoor exercise, fresh air, sunlight and "yard" a privilege by definition and not a basic human need as the courts over and over have termed it. Since the defendants pick and choose, directing officers on who to write-up and who not to, upon information and belief the plaintiffs allege that they are intentionally targeting those of our faith for write-ups. Defendants must provide the plaintiffs with opportunities for exercise outside of their cells, and defendants cannot deprive the plaintiffs herein of outdoor exercise, fresh air, and sunlight for long periods, of any-where from forty to one hundred days in length, simply by terming those basic human needs as "privileges". Theoretically, under the defendants illegal scheme a write-up every three months, three total, would result in 270 days loss of yard if one was at 90 day loss levels (90+90+90=270). Plaintiffs Harless and Cain's physical health was put at risk, their psychological health was adversely affected, and their safety was also thereby jeopardized. Accordingly, this Complaint arises.

## DECLARATORY AND INJUNCTIVE RELIEF ALLEGATIONS

1.) An actual and substantial controversy exists between Plaintiffs Cain, Harless and Granger along with all similarly situated inmates housed at MCSP, on the one hand, and the defendants, on the other hand, as to their respective legal rights and duties. The Plaintiffs and all similarly situated inmates contend that the defendants' denominational minimum qualifications for chaplain positions are both discriminatory and illegal. Defendants contend the restriction is valid. The Plaintiffs herein, on behalf of the Asatrú-Odinist/Pagan/Heathen Inmate Class, also contend that the selection of only five faiths for state chaplain civil service classifications, without the application of objective criteria and periodic review of which religions fit within those criteria, and the attendant benefits and privileges the state bestows on the Five State-Sanctioned Faiths, is an illegal establishment of religion. The Plaintiffs and the Asatrú-Odinist/Pagan/Heathen Inmate Class allege that, on information and belief, defendants contend the "Five State-Sanctioned Faiths Policy" is valid. Plaintiffs have no plain, speedy or adequate remedy at law. A declaration that the policies, practices, actions, and ommissions such as are alleged and asserted herein are unconstitutional and contrary to law is appropriate.

2.) If not enjoined by this Honorable Court, defendants will continue to restrict the Plaintiffs' and the Asatrú-Odinists'/Pagans'/Heathen Inmates' at MCSP in their ability to exercise their religion by denying equal access to clergy, multi-faith chapel classroom use, religious artifacts, and by hindering and obstructing their access to the courts. These restrictions and others will further impose irreparable injury on

on the Plaintiffs and other similarly situated individuals at MCSP. The defendants

1    will continue to treat Plaintiffs Cain, Harless, Granger and the Asatrú-Odinist/

2    Pagan/ Heathen Inmate Class at MCSP disparately, retaliate against them, and

3    deny them equal protection under the law. This continuing discriminatory

4    treatment will impose irreparable injury on the Plaintiffs herein and the Asatrú-

5    Odinist/ Pagan/ Heathen Inmate Class at MCSP as well. The Plaintiffs and others

6    at MCSP similarly situated have no plain, speedy or adequate remedy at law.

7    3.) Injunctive relief including, but not limited to, an order enjoining defendants'

8    future policies, practices, actions, and ommissions such as are alleged herein, and

9    requiring the reformation of the defendants' policies, practices, actions, and ommissions

10   so as to eliminate their discriminatory effect, are therefore appropriate and necessary

11   to avoid irreparable harm to Plaintiffs and to effectuate the purposes of the

12   United States and California Constitutions, RLUIPA and other statutes and laws

13   referenced herein as the subject of this complaint's claims for relief.

14   4.)     Although specific "Appropriate Relief" is not defined in RLUIPA, both

15   injunctive and declarative relief, as well as damages should be available.

16   The United States Supreme Court has held that there is a presumption

17   that a Federal Statute creating a private cause of action permits the

18   recovery of damages; Franklin v. Gwinnett County Public Schools, 503

     U.S. ; 112 S. Ct. 1028, 1034-35.

     \\

     \\

(89.)

## FIRST CLAIM FOR RELIEF

Fourteenth Amendment: Equal Protection Clause

(Plaintiffs' Cain, Harless and Granger, individually and on behalf of all others similarly situated, Against All Official Capacity Defendants and All Individual Defendants)

1.) Plaintiffs refer to and incorporate by reference herein the allegations of this complaint as if fully set forth in this claim for relief.

2.) The actions against defendants complained of herein are brought pursuant to 42 U.S.C. § 1983 because defendants' conduct constitutes an ongoing violation of the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution. Defendants' policies, practices, acts and ommissions deprive the Plaintiffs and the Asatrú-Odinist/Pagan/Heathen Inmate Class, either directly or indirectly, of equal access to privileges and benefits granted as a matter of course to Five State-Sanctioned Faiths practitioners, without any objective, content neutral justification for such discrimination and without establishing that the actions of the defendants furthers penological goals.

3.) The above-named defendants undertook the policies, practices, actions and ommissio alleged in this complaint intentionally and with willful disregard for the rights of the Plaintiffs and others similarly situated.

4.) In violating the Plaintiffs' and the Asatrú-Odinist/Pagan/Heathen Inmate Clas rights under the Fourteenth Amendment to the United States Constitution, Defenda directly and proximately caused Plaintiffs Cain, Harless, Granger and the

Asatru-Odinist | Pagan | Heathen Inmate Class to suffer significant emotional distress, humiliation and dignitary harms, among other injuries.

5.) Defendants have freely allowed the Five-State Sanctioned Faiths inmates to have clergy, to have their own inmate clerks, where as Plaintiffs have to do their own clerical work of generating ducat lists, memorandums, and requests for accomodation at their own expense, nor are the Plaintiffs given job positions or pay numbers as an Asatru-Odinist / Pagan / Heathen clerk or clergy.

6.) Asatru-Odinist | Pagan | Heathen worship study groups and services are never announced over the P.A. system which makes the release always late and a problem perpetually, unlike the Five Faith services, that are always announced and on time.

7.) The Plaintiffs and others similarly situated must purchase and keep | store their own religious books where as the Five Faith religions have a religious library in their respective Chaplain offices and a chapel library as well. Asatru-Odinist inmates are forced to hold to an unequal ten (10) book limit, which counts for legal, personal, educational, library and religious books.

8.) As the proximate result of the Defendants' conduct, Plaintiffs have suffered and continue to suffer general damages caused by the denial of clergy, an inmate clerk and failing to remove the unequal 10 book limit of our religious. The Five State-Sanctioned Faiths have long enjoyed better than the above.

9.) In acting as described in this complaint Defendants' have acted despicably, knowingly, willfully, and maliciously, and / or with reckless or callous disregard

(91.)

for Plaintiffs federally protected right of equal protection, entitling the Plaintiffs
and other similarly situated to the award of exemplary and punitive damages.

10.) Injunctive relief is warranted also by the allegations set forth throughout
this complaint and as specifically alleged herein supra.

## SECOND CLAIM FOR RELIEF

First and Fourteenth Amendments: Free Exercise of Religion

( Plaintiffs' Cain, Harless and Granger, individually and on behalf of all others
at MCSP similarly situated, Against All Official Capacity Defendants and All
Individual Defendants)

1.) Plaintiffs refer to and incorporate by reference herein the allegations of this
complaint as if fully set forth in this claim for relief.

2.) The First Amendment to the United States Constitution, as incorporated thru
the Fourteenth Amendment, prohibits defendants from enacting regulations and
policies that result in "establishment of religion, or [that] prohibit the
free exercise thereof."

3.) The actions against defendants complained of herein are brought pursuant to 42
U.S.C. § 1983 because defendants conduct constitutes a violation of the Free
Exercise Clause of the First Amendment to the U.S. Constitution. Defendants'
policies, practices, acts and ommissions substantially burden the ability of the
Asatrú-Odinist | Pagan | Heathen Inmate Class at MCSP to practice their religion
and prevent them from engaging in religious ceremonies and rites that form the

(92.)

8.) The above-named defendants undertook the policies, practices, actions, and ommissions alleged in this complaint intentionally, and with a willful disregard for the rights of the Plaintiffs' and other similarly situated inmates at MCSP, entitling plaintiffs to an award of exemplary and punitive damages.

9.) As the proximate result of the defendants' conduct, Plaintiffs have suffered and continue to suffer general damages in the denial and/or obstruction of their ability to acquire the required artifacts and items for basic practice, or have unimpeded use of a permanently erected area to practice, or just be free to observe their religious tenets, bringing great emotional distress.

10.) Injunctive relief is warranted also by the allegations set forth throughout this complaint and as specifically alleged herein.

## THIRD CLAIM FOR RELIEF

First and Fourteenth Amendments: Establishment Clause (Section 1983) (Plaintiffs' Cain, Harless and Granger, individually and on behalf of similarly situated inmates at MCSP, Against All Official Capacity Defendants and All Individual Defendants)

1.) Plaintiffs refer to and incorporate by reference herein the allegations of this complaint as if fully set forth in this claim for relief.

2.) The actions against Plaintiffs complained of herein are brought pursuant to 42 U.S.C. § 1983 because defendants' conduct constitutes a violation of the Establishment Clause of the First Amendment to the U.S. Constitution, as

incorporated through the Fourteenth Amendment. Defendants' policies, practices, acts and omissions in sponsoring chaplains only from the Five State-Sanctioned Faiths religions, without any objective, content neutral justification for such discrimination, endorsed and firmly established those five religions.

3.) The above-named defendants undertook the policies, practices, actions, and omissions alleged in this complaint intentionally and with willful disregard for the rights of the plaintiffs and the Asatru-Odinist/Pagan/Heathen inmates similarly situated at MCSP.

4.) In violating Plaintiffs and other similarly situated individuals' rights under the First Amendment to the United States Constitution, defendants directly and proximately caused the Plaintiffs and the MCSP Asatru-Odinist/Pagan/Heathen inmate class to suffer and continue to suffer emotional distress, humiliation and dignitary harms, among other injuries.

5.) Injunctive relief is warranted, warranted by the allegations set forth throughout this complaint and as specifically alleged herein.

## FOURTH CLAIM OF RELIEF

First, Fifth and Fourteenth Amendment Violations : Rights to petition the Government For Redress of Grievances Without Being Retaliated Against, and to Procedural and Substantive Due Process of Law

( Plaintiffs Cain, Harless and Granger, individually and on behalf of similarly situated inmates at MCSP, Against All Official Capacity Defendants and all

(95.)

continue to suffer damages in the denial and impeding of plaintiffs' ability to
petition the government for redress of grievances without fear of retaliation.

7.) As a further proximate result of defendants conduct, plaintiffs are informed and thereon allege that they will suffer special damages in the future, due to defendants furthering an underground "code of silence" in the mistaken notion that they are themselves above the law.

8.) In acting as described in this complaint defendants acted despicably, knowingly, willfully, maliciously and/or with reckless or callous disregard for plaintiffs federally protected rights, entitling plaintiffs to an award of exemplary and punitive damages.

9.) Injunctive relief is warranted by the allegations set forth throughout this complaint and as specifically alleged herein.

### FIFTH CLAIM FOR RELIEF

Religious Land Use and Institutionalized Persons Act Violation ( $U.S.C. \ \S\S 2000$ cc, et seq.) (RLUIPA)

(Plaintiffs Cain, Harless and Granger, individually and on behalf of similarly situated inmates at MCSP, Against The CDCR, the OCR defendants, the Institutional Defendants, All Official Capacity Defendants and All Individual Capacity Defendants)

1.) Plaintiffs refer to and incorporate by reference herein the allegations of this complaint as if fully set forth in this claim for relief.

2.) The Religious Land Use and Institutionalized Persons Act prohibits any substantial burden on the free exercise of religion unless it (1) furthers a compelling governmental interest, and (2) is the least restrictive means of furthering that compelling interest. Restrictions that merely further a legitimate penological interest are invalidated by RLUIPA.

3.) The CDCR receives financial assistance from the United States Government.

4) The policies, practices, actions, and ommissions alleged in this complaint substantially burden the plaintiffs' and other similarly situated inmates at MCSP's' exercise of religion in violation of U.S.C. §§ 2000 cc, et seq. and threaten to continue burdening their religious practice.

5.) These burdens on the plaintiffs' religious practice are not the least restrictive means of furthering any compelling government interest.

6.) The above-named defendants undertook the policies, practices, actions, and ommissions alleged in this complaint intentionally and with willful disregard for the rights of the plaintiffs and those similarly situated at MCSP.

7.) As a direct and proximate cause of the policies, practices, actions, and ommissions of the defendants alleged in this complaint, Plaintiffs and others similarly situated have suffered and continue to suffer emotional distress, humiliation and dignitary harms, among other injuries.

8.) Damages, declarative and injunctive relief are warranted by the allegations set forth throughout this complaint and as specifically alleged herein.

(98.)

## SIXTH CLAIM FOR RELIEF

Article 1, § 4 Of The Constitution Of The State of California Violation

( Plaintiffs Cain, Harless and Granger, individually and on behalf of others similarly situated at MCSP, Against All Official Capacity Defendants and all Individual Defendants)

1.) Plaintiffs refer to and incorporate by reference herein the allegations of this complaint as is fully set forth in this claim for relief.

2.) Article I ( Declaration of Rights) § 4 of the Constitution of the State of California provides, in pertinent part : " Free exercise and enjoyment of religion without discrimination or preference are guaranteed.... The legislature shall make no law respecting an establishment of religion. "

3.) The Five State-Sanctioned Faiths Policy in itself and as applied, and the other policies and the practices, actions, and ommissions of the defendants alleged in this complaint violate the proscriptions of Article I, § 4 of the Constitution of the State of California.

4.) The Five State-Sanctioned Faiths Policy in itself and as applied and the other policies and the practices, actions, and ommissions of the defendants alleged in this complaint have prevented and discouraged Asatrú-Odinist clergy from applying for a position as a chaplain in any CDCR institution, being hired for a position as a chaplain in any CDCR institution, and/or even from being reimbursed per diem and for expenses incurred as a volunteer chaplain in any institution.

(99.)

5.) The Five State-Sanctioned Faiths Policy in itself and as applied and the other policies and the practices, actions, and ommissions of the defendants alleged in this complaint have prevented Plaintiffs free exercise of religion by permitting religious discrimination itself to be state sponsored.

6.) The above-named defendants undertook the policies, practices, actions, and ommissions alleged in this complaint intentionally and with willful disregard for the rights of the Plaintiffs and others similarly situated at MCSP.

7.) As a direct and proximate cause of these policies, practices, actions, and ommissions of the defendants alleged in this complaint, Plaintiffs Cain and Harless and Granger, on behalf of all others similarly situated, suffered and continue to suffer emotional distress, humiliation and dignitary harms, among other injuries, and the plaintiffs' have suffered and, on information and belief will continue to suffer special damages including, but not limited to, lost or unlawfully seized or destroyed personal properties, damages incurred in retaliation, according to proof.

8.) Defendants undertook the policies, practices, actions, and ommissions alleged in this complaint willfully and with deliberate disregard for the rights of Plaintiffs Cain, Harless, Granger and others similarly situated.

9.) Declarative, injunctive and other relief is warranted by the allegations set forth throughout this complaint and as specifically alleged herein.

## SEVENTH CLAIM FOR RELIEF

Eighth Amendment Violation— Right To Be Free From Cruel And Unusual Punishment

( Plaintiffs Cain, Harless and Granger, individually and on behalf of all others similarly situated, Against All MCSP Official Capacity Defendants)

1.) Plaintiffs refer to and incorporate by reference herein the allegations of this complaint.

2.) Defendants must provide prisoners with opportunities for exercise outside of their cells, and defendants cannot deprive prisoners of outdoor exercise for long periods of time. The defendants took Plaintiff Cains and Plaintiff Harless "Yard" for long periods of time, labeling "yard" as a privilege and not a right, for rules violations.

3.) Plaintiffs are informed and believe and thereon allege that defendants pick and choose who they want to write up or not, acting intentionally in the manner described above with full Knowledge of the violation to plaintiffs' rights under the Eighth Amendment to the United States Constitution.

4.) As a direct and proximate result of the defendants conduct, the plaintiffs' physical health was put at risk and adversely affected, as well as their psychological well-being by being couped up in a cell that two live in but that was meant to house only one inmate. The plaintiffs' safety was also thereby jeopardized. What maximum security inmate wants to see his cellmate never leave his cell for long periods of time?

(101.)

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Cain, Harless, Granger and the Asatrú-Odinist/Pagan/ Heathen Inmate Class at MCSP, individually and on behalf of all others similarly situated, request that this court do the following:

(a) Assume jurisdiction over this action;

(b) Issue an order certifying this action to proceed as a class pursuant to Rules 23(a) and (b) of the Federal Rules of Civil Procedure;

(c) Issue a judgement pursuant to 28 U.S.C. §2201 and Rule 57 of the Federal Rules of Civil Procedure declaring that the Five State-Sanctioned Faiths hiring policy is unconstitutional on its face and that policies, practices, acts and ommissions complained of herein violate the plaintiffs' and others similarly situateds' rights as set forth herein;

(d) Issue permanent injunctive relief restraining defendants and their officers, agents, directors, successors, employees, attorneys, or representatives from further violations of the First, Fifth, Eighth and Fourteenth Amendments to the United States Constitution, Article 1, §4 of the Constitution of the State of California, RLUIPA, and any other state or federal statutes and laws later referenced by supplemental complaint herein as the subject of plaintiffs' and others similarly situateds' claims for further relief from retaliation, including but not limited to enjoining defendants from further policies,

(102.)

practices, actions, and ommissions such as those alleged herein, and requiring the establishment of appropriate and effective means to prevent future such violations;

(e) Retain jurisdiction over defendants until such time that this Honorable Court is satisfied that the defendants' unlawful policies, practices, acts and ommissions no longer exist and will not recur;

(f) For Asatrú-Odinism to be recognized formally by CDCR;

(g) To be provided a paid Chaplain and an Inmate Clerk of our faith;

(h) To be able to essential artifacts, herbs, oils, candles, crystals, stones, Gandr's, Horns, runes, bowli's, statuettes, ritual tobacco, drums, beads, rune cards, hammers, pendants, incense, books and those other articles mentioned in this complaint essential to the basic practice of our religion, and keep in our possession those artifacts which are not a threat to the safety and security in keeping with the least restrictive means standards. That this procedure be uniform for every institution that accomodates Asatrú-Odinist/Pagan/Heathen inmates' orders from approved vendors;

(i) To have access to one permanent outdoor site for monthly rituals, and weekly rites, and daily workings, and to have the site fenced in and erected for usage with an altar, a fire pit, lockers,

(103.)

an area for firewood, a small herb garden, a water source, as is established already for the Native American inmates at MCSP;

(J) To be afforded time off of work or school assignments for weekly Worship Study Groups, monthly Days of Remembrance and Holy Days of our faith;

(K) To be permitted to have more than 10 books in ones cell if none are likewise available of our religion anywhere else;

(l) To be treated equally with all other religions, whether it comes to announcements, vendors, orders, accessibility or just in interactions with staff;

(m) To receive funding like other religions in MCSP;

(n) For General Damages according to proof;

(o) For Special Damages according to proof;

(p) For Punitive Damages according to proof;

(q) For award of costs to file and maintain suit including attorneys' fees pursuant to 42 U.S.C. §1988 and RLUIPA against each defendant jointly and severally, or apportioned in the discretion of the court for all counts;

(r) Award such other and further relief as this Honorable Court deems just and proper.

## REQUEST FOR JURY TRIAL

Plaintiffs Cain, Hartless, Granger and the Asatrú/Odinist/Pagan/Heathen Inmate

(104.)

Class request a jury trial,

1

2      I have read the forgoing complaint and hereby verify that the matters
3  alleged therein are true, except as to matters alleged on information and belief,
4  and, as to those, I believe them to be true. I certify under penalty of
5  perjury that the foregoing is true and correct.

6

7              Executed at Ione, California on July 27th, 2006,

8

9                              Respectfully Submitted,

10

11              x  Paul Odinson Cain
                   Paul O. Cain, K68828
12                 C-12-232 Lower
                   P.O. Box 409060
13                 Ione, CA 95640
                   Pro Per
14

15

16  Ben V. Horless, K95374              x M.Cordrewder Granger
    A-1-250 Lower                         Andrew Lee Granger, C36469
17  P.O. Box 409020                       A-3-140 Upper
    Ione, CA 95640                        P.O. Box 409020
18  Pro Per                               Ione, CA 95640
                                          Pro Per